## UNITED STATES v. AMERICAN TOBACCO CO. et al.

(Circuit Court, S. D. New York. November 15, 1911.)

1. MONOPOLIES (§ 20*)—ANTI-TRUST ACT—COMMON STOCKHOLDING IN CORPORATIONS.

The fact that the common stock of two or more corporations, engaged in the same general lines of business, is owned by the same body of individual stockholders, does not alone create a condition of monopoly repugnant to the provisions of the Sherman anti-trust act (Act July 2, 1890, c. 647, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200]).

[Ed. Note.—For other cases, see Monopolies, Dec. Dig. § 20.*]

2. MONOPOLIES (§ 26*)—ANTI-TRUST ACT—DISSOLUTION OF ILLEGAL COMBINATIONS.

In dissolving a combination adjudged to be in restraint of interstate commerce and to constitute a monopoly in violation of the Sherman anti-trust act (Act July 2, 1890, c. 647, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200]), and recreating from its elements a new condition in harmony with and not repugnant to the law, a court is not required to reject a proposed plan of reorganization by creating new corporations between which the property and business of the illegal combination is to be distributed because such corporations will be themselves largely capitalized, which does not in and of itself render them illegal, where the capitalization of neither is sufficient to enable it to dominate the business, and each is restrained by a permanent injunction from combining with any other company; nor should further restrictions be imposed on them to which other corporations engaged in the same line of business are not subjected by the law.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 17; Dec. Dig. § 26.*]

3. MONOPOLIES (§ 26*)—ANTI-TRUST ACT—SUIT FOR VIOLATION—DISSOLUTION OF ILLEGAL COMBINATION.

Where a Circuit Court, pursuant to the mandate of the Supreme Court, has approved a plan for dissolution and reorganization of a combination

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

*adjudged to be in violation of the Sherman anti-trust act (Act July 2, 1890, c. 647, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200]), by distributing its property between existing corporations and others organized for the purpose, the court is without power to retain jurisdiction to retake possession of the property from its new owners in case the plan adopted shall prove unsatisfactory, or because of future violations of the law.*

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 17; Dec. Dig. § 26.*]

**4.** MONOPOLIES (§ 26*)—ANTI-TRUST ACT—SUIT FOR DISSOLUTION OF ILLEGAL COMBINATION—DECREE.

By a decree of the Supreme Court the American Tobacco Company was adjudged an illegal combination, in restraint of interstate commerce, and a monopoly, in violation of the Sherman anti-trust act (Act July 2, 1890, c. 647, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200]), and 29 individual defendants, owning 56 per cent. of its common stock, were adjudged parties to such illegal combination. The cause was remanded to the Circuit Court to hear the parties "for the purpose of determining upon some plan or method of dissolving the combination, and of recreating out of the elements now composing it a new condition which shall be honestly in harmony with, and not repugnant to, the law." The defendant company had property and assets of some $300,000,000 in value, and by means of its own plants, etc., and through other corporations in which it acquired a majority of the stock, controlled approximately 80 per cent. of the business of the United States in tobacco and allied products as well as a very large proportion of foreign business. The plan proposed, as amended and approved by the court, provided in outline that the company should transfer plants and property to the value of over $100,000,000, dividing its previous business between four corporations, and with the proceeds of such property should retire its bonds to the amount of about $100,000,000, thus reducing its working capital and assets; that its preferred stock, exceeding its common stock, previously nonvoting, should be given full voting rights; that the subsidiary and controlled companies should be similiarly subdivided and their preferred stock given voting rights, so that the business previously controlled by it should be in the hands of 14 separate corporations; that its share of the stock of such corporations should be distributed among its stockholders; that all contracts or covenants between it and any of its subsidiary companies, or between it or them and third parties, in restraint of interstate or foreign commerce, should be abrogated. The decree further contained sweeping injunctive provisions restraining each of the 29 individual defendants from increasing his interest in any of the 14 corporations, and restraining such corporations from acquiring stock in each other, or having common officers or directors, and from entering into any combination or contract with each other in violation of law.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 17; Dec. Dig. § 26.*]

In Equity. Suit by the United States against the American Tobacco Company and others. On settlement of final decree.

See, also, 164 Fed. 1024; 221 U. S. 106, 31 Sup. Ct. 632, 55 L. Ed. 663.

W. W. Fuller, Lewis Cass Ledyard, De Lancey Nicoll, and Junius Parker, for petitioners.

William B. Hornblower, John Pickrell, William W. Miller, and Morgan M. Mann, for defendant Imperial Tobacco Co. of Great Britain and Ireland.

S. M. Stroock, for defendant United Cigar Stores Co.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

The Attorney General, Henry A. Wise, U. S. Atty., and James C. McReynolds. Special Asst. Atty. Gen., for the United States.

Joseph H. Choate, for committee of holders of 6 per cent. bonds of American Tobacco Co.

Morgan J. O'Brien, for committee of holders of 4 per cent. bonds of American Tobacco Co.

Adrian H. Larkin, for committee of holders of preferred stock of American Tobacco Co.

L. C. Krauthoff, for certain holders of common stock of American Tobacco Co.

Louis D. Brandeis and Felix Levy, for National Cigar Leaf Tobacco Ass'n, Cigar Manufacturers' Ass'n of America, and Independent Tobacco Salesmen's Ass'n of America.

Henry H. Hunter, for Independent Retail Tobacconists.

Samuel W. Williams, Atty. Gen. of Commonwealth of Virginia, for himself, T. W. Bickett, Atty. Gen. of State of North Carolina and J. Fraser Lyon, Atty. Gen. of State of South Carolina.

William A. McQuaid, for Thomas Carmody, Atty. Gen. of State of New York.

John W. Yerkes, for Independent Tobacco Manufacturers' Ass'n.

E. J. Justice and S. A. Woodard, for Farmers' Union of North Carolina.

D. Walter Brown, for Ludington Cigarette Mach. Co.

Paul C. Schnitzler, pro se.

Before LACOMBE, COXE, WARD, and NOYES, Circuit Judges.

LACOMBE, Circuit Judge. In compliance with the directions of the Supreme Court we have heard the parties upon a plan proposed by the American Tobacco Company for "dissolving the combination and for recreating out of the elements now composing it a new condition which shall honestly be in harmony with and not repugnant to the law." The proposed plan was filed two weeks before this hearing, at which not only the parties, but any persons interested who might wish to express their views as friends of the court, were given opportunity so to do.

While the plan is correctly described as the proposed plan of the American Tobacco Company, since that corporation and the other defendants offer to carry it out, it should be remembered that in its present form the plan is the fruit of much discussion. For upwards of two months successive conferences, in the presence of two or more members of the court, were had between the Attorney General and the counsel and representatives of the Tobacco Company. Objections of the Attorney General were followed by modifications of the plan; some of its most drastic provisions being inserted in order to meet or avoid his criticisms. When a point was reached where such adjustment of differences ceased to be practicable, a time was fixed for a hearing before the whole court upon the matters remaining in dispute. It was in the course of these conferences that a very material reduction of the holdings of the American Tobacco Company was brought about. According to the plan as originally proposed, it was

to retain in its treasury, in addition to its working capital, sufficient to pay the outstanding bonds when they matured, about $104,000,000. To this the Attorney General at once objected, insisting that the possession of this enormous amount of money over and above its capital invested in the tobacco business was fraught with possibilities of evil use; that it would be a standing menace to all competitors and could not be tolerated. While not fully conceding the justice of this criticism, counsel for defendants promptly stated that they would undertake to eliminate it. After discussion of two different methods of so doing, they themselves at the last conference submitted the present scheme, whereby half of the outstanding bonds would be bought up (and canceled) at a price in excess of their present value, thus insuring a willing surrender of them by present holders, and for the other half securities of the new companies would be offered on a basis of exchange which would insure acceptance of the offer. Since the plan was filed the market reports have given quotations of such bonds of the new companies "if and when." While such reports are possibly not competent evidence in the trial of a cause, they seem to indicate that, if the present plan be approved, a very brief period will suffice for the disappearance of substantially all the old bonds and the elimination from the treasury of the American Company of the money or securities required to make them good at maturity. Thus the menace of holding an enormous amount of money, additional to what is legitimately used in the business of the American Company, will disappear. Upon the hearing, committees representing a majority of the holders of both issues of bonds appeared and requested the court to approve the plan. Out of the entire two issues, amounting to over $100,000,-000, one holder only of ten 4 per cent. bonds appeared to object on the ground that the terms offered for sale and exchange were not satisfactory to him. Inasmuch as he is under no obligation to accept the offer if it does not please him, and the security for his bonds, if the plan be carried out, will be ample, no modification of the plan is necessary to protect him or others similarly situated. A committee representing a majority of the preferred stockholders also asked that the proposed plan be approved.

The plan contains very many provisions, necessarily so because of the intricate nature of the combination of corporations about to be disrupted. It would unreasonably extend this opinion to undertake to epitomize these provisions. An admirably clear summary of them has been filed by the proponents, and may be considered as in the nature of a recital to this opinion. Besides distributing among its common stockholders a large amount of the stock it now holds in other companies, the American Tobacco Company will be split into three companies which, with a fourth set free of control by the American Company through such distribution of stock, will divide between themselves the property now owned and the business now done by the American Company. Each of these four companies will thus have a business which in every branch of it will fall materially below a percentage sufficient to control. There are similar disruptions among the accessory

companies, for the details of which the plan or the summary may be consulted.

Some of those who have been heard in opposition insist that no plan is practicable; that in conformity with the statute as construed by the Supreme Court the only thing for this court to do is to seize the property through receivership, and proceed to sell it. This proposition need not be discussed. Evidently the Supreme Court believed some plan was practicable, or it would not have directed this court to inquire into the matter.

Upon the hearing other plans for dissolving and recreating were submitted, plans not merely suggesting modifications of the one proposed, but differing widely from it in form and scope. One of them calls for a division into upwards of 60 different companies, others for a distribution of properties by specific allotments, as in the case of a partition of real estate. No time need be given to a consideration of any of these, since there is no suggestion that the defendants will adopt them. On the contrary, counsel for the defendants expressly stated on the argument that they would not undertake to carry them out. Presumably they think they might better take their chances at receiver's sale. This court has neither authority nor power to carry out and enforce any plan of readjustment without the co-operation of the owners of the property, the holders of these stocks and bonds. It would be a sheer waste of time, therefore, to consider any plan radically different from the one now before us. If we find this plan would not create the conditions defined in the opinion of the Supreme Court, or if such modifications as we may require as a condition of giving our approval are not accepted by defendants, we must obey the mandate of that court, must seize the property, and sell it at public auction in appropriate and convenient lots, applying the proceeds of the sale to the payment of the debts (including the mortgages) or of such dividend thereon as the proceeds may allow, turning over the surplus, if any, to the owners of the equity.

[1] The main objection to the proposed plan, an objection found in every document filed by those who were given permission to be heard and which seemed to be principally relied on by those who spoke, is what is referred to as "common stockholding." For instance, under the plan two new companies, "Lorillard" and "Liggett & Myers," will be formed out of the American, which will itself, thus reduced in size, continue in existence. The same individuals, the present 1,800 or more common stockholders of the American, will hold the entire common stock of each of the other two companies. A similar condition will exist with some, at least, of the other companies. It is contended that, although under such circumstances there may be potential competition, no real competition can exist. With this argument or the reply to it, it seems to me this court is not concerned. In two recent cases (the Northern Securities and the Standard Oil) the Supreme Court found a combination of corporations to have offended against the anti-trust act. As a result of such finding there was a disintegration of the combination. In each the disintegration left the stock of the separate entities into which the group was split in the hand of the

same body of individual stockholders. Since there was no disapproval of this method of disintegration indicated in either opinion, it would seem that the question whether or not common stockholding is "repugnant to the law"—that is, repugnant to the anti-trust act—has been settled for this court by controlling authority.

It is true that the Supreme Court did not enter into any discussion of this question of "common ownership," but its existence in both cases was so plainly manifest that it is difficult to understand how the court could have approved of the new arrangement, unless it was satisfied that such arrangement did not contain the same vice as the old one, which they held must be terminated. If this be so, discussion here of the question whether or not common ownership is within the prohibition of the statute would seem to be academic. This also seems to be the view of the government, which does not discuss common stockholding.

[2] The next objection presented by those not parties who have been heard is directed to the size of the companies. As an illustration, it appears from the statistics submitted that of the total smoking tobacco business of the country four companies will have the following percentages: American, 33.08; Liggett & Myers, 20.05; Lorillard, 22.82; Reynolds, 2.66. It is insisted that these large companies should be still further disintegrated. The plan is further criticised because each of these companies is described as "completely equipped for the conduct of a large tobacco business," whereas existing independent concerns are none of them so equipped, and it is argued that there can be no effective competition until the several concerns which are to carry forward the business of the trust are put into the same condition as to size and equipment as now prevails among existing independent concerns. It is further contended that no company engaged in the plug tobacco business should be allowed to take over any cigarette or cigar business; that a company taking a cigarette business should not take over any smoking tobacco, plug, or cigar business, and so on; that there should be a rearrangement of factories and brands, an intricate subject, which is fully discussed in a report from the bureau of corporations, filed at the hearing. Manifestly the minuter the fragments into which the old combination is split, and the more they are prohibited from conducting business as other companies are free to conduct it, the less will be their ability to compete with such other companies. This whole line of argument deals with the economics of the tobacco business. No doubt the novel problem presented to this court is connected with questions of economics as well as with questions of law. But this is a court of law, not a commerce commission, and the legal side of the proposition would seem to be the controlling one. The true way to state the problem, as I understand it, is this: Assume that a group of corporations engaged in some business which comes within the domain of interstate commerce is charged before the Supreme Court with violation of the anti-trust act. Assume that they are organized as the companies provided for in this plan will be; that they are similarly capitalized; that the business they do is similar in amount and similarly distributed; that their stock is similarly held,

with the natural temptation to co-operate which such common stock-holding may be calculated to induce, but are also curbed and restrained from yielding to such temptation as these companies will be by the injunction which will accompany our approval of this plan, a permanent injunction binding all defendants in this suit and their privies, and all new companies created under the plan and their privies. Would the Supreme Court hold that the condition thus presented was "repugnant to the law"—that is, repugnant to the anti-trust statute? A long and careful study of the last two deliverances of that court (in the Standard Oil Case and in this case) has convinced me that its answer to that question would be in the negative. I may be wrong in interpretation of its deliverances—if so, it will not be for the first time—but, since such is my conviction, there would seem to be no necessity for discussing on its economic side a question already settled by controlling authority.

Leaving for the moment the objections and suggestions of persons not parties, those of the Attorney General may be next considered. He does not attack the general features of the proposed plan with its division of the business controlled by the old company among 14 companies, nor does he contend that "common stockholding" is in and by itself an infraction of the anti-trust statute. His suggested modifications are directed mainly towards providing such safeguards for the future that the 14 companies may not so conduct their operations as to violate the provisions of the statute.

He requests that the following conditions to any approval of the plan submitted be imposed—presumably the more convenient way to impose most of such restrictions would be by injunctive provisions incorporated in the final decree:

(1) That during a period of not less than five years no one of the corporations among which the properties and businesses now in the combination are to be distributed shall have any officer or director who is also an officer or director in any other of such corporations.

This suggestion is approved.

(2) That the plan be so modified that the principal company shall dispose of, and, when the disintegration is complete, shall not retain any of the stocks of any of the accessory companies, and each of the accessory companies shall dispose of all of the stocks held by it of the principal and of each of the other accessory companies held by it.

The general proposition here advanced is sound and is approved, but the last clause seems to be already provided for, and there is probably an exception or two necessary to be made in the first clause by reason of the rights of outstanding stockholders not connected with the American Tobacco Company. Counsel can probably agree as to phraseology which will conform more especially to the facts.

(3) That no one of the corporations among which the property and businesses now in the combination are to be distributed shall during the same period retain or employ the same agency for the purchase of tobacco leaf or other raw material, or for the sale of tobacco or other products, as that of any other of such corporations.

There should be a change of phraseology in this and some of the

other requests. It is not entirely clear whether the prohibition is directed to all the 14 companies or only to a part of them. It should apply to all. After the words "agency for the purchase" there should. be added the words "in the United States." This request with such modifications is approved, and counsel may agree on a phraseology which will cover any possible exceptions arising from the allotments in the plan.

(4) That no one of the corporations among which the property and businesses now in the combination are to be distributed shall retain or employ the same clerical or other organization, or occupy the same office or offices as any other of the said corporations.

This is approved, with modifications similar to those indicated as to the request next above.

(5) That no one of the corporations among which the properties and businesses now in the combination are to be distributed shall retain and hold capital stock in any other corporation, any part of whose stock is also retained and held by any of the other of the corporations among which such properties and businesses are to be distributed, or shall purchase or acquire any stock in any other of such corporations.

This is approved, but should contain an exception, upon which it is understood counsel are in accord, in the single case of the Porto Rican Leaf Tobacco Company. Counsel may agree upon the phraseology to be inserted in the decree.

(6) That no one of the corporations among which the properties and businesses now in the combination are to be distributed shall, during a period of five years, directly or indirectly, acquire any stock in any one of the others of said corporations, or purchase or acquire the property or business, or both, of any other of said corporations.

With a change of phraseology which will make this applicable to all the 14 companies, this request is approved. A similar request is found among those submitted by other objectors, with an additional clause forbidding any one of these 14 companies "from making loans or otherwise extending credit" to any of the others. This suggestion is a proper one and may be embodied in the Attorney General's request.

(7) To the end that the 29 individual defendants in this suit shall not increase their control over any of the corporations among which the properties and businesses now in the combination are to be distributed, pursuant to the plan that such defendants be severally enjoined from, at any time within five years from the date of the decree, acquiring, directly or indirectly, the legal or equitable ownership of any amount of stock in any one of said corporations in addition to the amounts which they will respectively hold if and when the plan shall have been carried out as proposed.

This is approved, but the phraseology should be modified as already indicated.

Upon the argument the Attorney General stated that he would be willing to substitute "three years" for "five years." Such change seems desirable, as it would probably result in more rapid distribution of present holdings. There should also be a proviso excepting from

the operation of this prohibition any and all sales and purchases by these 29 individuals inter sese, the phraseology of which counsel may agree upon.

It may not be a wise public policy to make it easy for foreigners to take over the control of the British-American Company, with its large and growing business in foreign countries, notably in South Africa and the Far East, now in American hands. That is what would probably happen if the 29 defendants be prohibited from increasing their holdings of that stock. We do not undertake to determine this question of public policy, which is one for the consideration of the executive branch of the government. It is sufficient to say that a further exception of the shares of that company from the operation of this paragraph would not in our opinion make the plan repugnant to the law.

(8) That the preferred stock of the American Cigar Company, aggregating in book value $2,530,216.69, held by the American Snuff Company, and the stock and bonds of American Tobacco Company, held by the American Snuff Company, referred to on page 11 of the plan (footnote "a"),[1] be sold or otherwise be disposed of within one year, instead of three years, as proposed in the plan, with leave to defendants to apply to the court to extend such period for not more than two years.

There seems to be no good reason for modifying the plan in this particular.

(9) That in the distribution of the properties and businesses now held in the combination pursuant to the plan of disintegration no corporation shall be allowed to acquire property, tangible or intangible, which would invest it with as much as 40 per cent. in volume or in value of any particular line of the tobacco business.

This is substantially what the plan now provides. The few instances in which the 40 per cent. limitation is exceeded result from inherent difficulties of distribution, which it seems impracticable to eliminate. These instances are so few, and the excess in each instance so small, as to be fairly negligible. The request is denied.

(10) That the stocks of the Liggett & Myers Tobacco Company and P. Lorillard Company, provided to be in accordance with the plan, be deposited with the Guaranty Trust Company of New York as the agent or depository of this court in this cause for the purposes specified in the plan, and that at the end of the period designated the court make an order for their further disposition. That in the meantime no voting right with respect to such stock shall be exercised, except as the court may from time to time order.

All of this is already sufficiently provided for in the plan.

(11) That all the covenants in any way restricting the right of any company or individual in the combination to buy, manufacture, or sell tobacco or its products should be rescinded by the affirmative action of the respective parties thereto, who are parties to this suit.

This is approved, except that there should be a proviso excepting certain foreign business, the phraseology of which counsel may agree upon.

---

[1] See 191 Fed. 400.

(12) That the action proposed in subdivision C of the plan on page 6 [2] terminating certain covenants be amplified so as to include like action with respect to all covenants not only concerning the tobacco business, but any other business which is in any way embraced in the combination.

This is approved. We understand the proposed plan as so providing in spirit, if not in letter.

(13) That all contracts or covenants between the American Tobacco Company or any other companies in the combination and the British-American Tobacco Company giving to the latter company the exclusive right to manufacture or sell brands belonging to any of the companies in the combination be rescinded or otherwise terminated.

The brands thus sold passed to the purchaser for a valuable consideration under an executed contract. The request is denied.

The fourteenth request deals with the United Cigar Stores Company, a subject which will be treated separately infra.

The Attorney General further asks for a comprehensive injunction to be incorporated in the final decree providing:

"That the defendants named in the petition, their respective officers, directors, agents, servants, and employés, be forever enjoined and prohibited from continuing or carrying into further effect the combination adjudged illegal by the Supreme Court, and from entering into or forming any like combination or conspiracy the effect of which is or will be to restrain commerce in tobacco or its products, or in articles used in connection with the manufacture and trade in tobacco and its products, among the states or in the territories or with foreign nations, or to prolong the unlawful monopoly of such commerce obtained and possessed by the defendants as adjudged herein in violation of the act of Congress approved July 2, 1890, either:

"(1) By causing the conveyance of the physical property and business of any of the corporations among which the properties and businesses now in the combinations are to be distributed to any other of said corporations, by placing the stocks of any one or more of said corporations in the hands of voting trustees or controlling the voting power of such stocks by any similar device; or,

"(2) By making any express or implied agreement or arrangements together or one with another like those adjudged illegal by the Supreme Court in this cause relative to the control or management of any of said corporations, or the price or terms of purchase or of sale of tobacco or any of its products, or the supplies or other product dealt with in connection with the tobacco business, or relative to the purchase, sale, transportation, or manufacture of tobacco, or its product or supplies or other product dealt with as aforesaid, by any of the parties hereto, which will have a like effect in restraint of commerce among the states, in the territories and with foreign nations, to that of the combination the operation of which is enjoined in this cause; or by making any agreement or arrangement of any kind with any other of such corporations under which trade or business is apportioned between such corporations, in respect either to customers or localities; or by any of such corporations doing business directly or indirectly under any other than their own corporate respective names; by refusing to sell to any jobber any brands of any tobacco product manufactured by it except upon condition that such jobber shall purchase from the vendor some other brand or product also manufactured and sold by it; or,

"(3) By the British-American Company and the Imperial Company employing a common agent for the purchase of leaf tobacco in the United States or by either of said two companies uniting with any of the corporations

_____
[2] See 191 Fed. 399.

among which the properties and businesses now in the combination are to be distributed in the employment of a common agent for the purchase of tobacco leaf."

The clause in the latter part of subdivision 2 as to each company doing business under its own corporate name should be made more specific, especially in view of the requests of other objectors that tobacco products should be sold only under the name of the owner. There should be nothing in the decree destroying the value of a brand or altering the classification of products in the records of the internal revenue bureau. Counsel may agree upon a modified phraseology to avoid any such difficulty leaving the 14 companies to pursue all ordinary methods prevailing in the tobacco business.

The clause as to refusing to sell to any jobber should be reconstructed so as not to prohibit any of the 14 companies from methods of business which are open to and practiced by all their competitors. Counsel may agree to a phraseology which will formulate this expression of opinion.

Clause 3 should be amended by adding the words "within the United States."

With these modifications, the entire section providing for injunctions is approved.

Returning now to the requests of the various other objectors, we find that nearly all of them are covered by those of the Attorney General or have been already disposed of by the discussion of the general features of the plan. Among those not so disposed of are noted requests that the 14 companies be enjoined.

(A) From giving away or selling at or below the cost of manufacture and distribution any of its products, from giving rebates, allowances, or other special inducements to purchasers or users, and from refusing to sell to any jobber any special brand he may require.

The record in this case shows that these are the common methods of the tobacco business, practiced by all alike. It is only by giving away samples, or by offering on favorable terms, irrespective of cost, that new brands of tobacco products can be introduced or old brands extended into new territory. All other companies are free to employ these methods, which are obnoxious to no statute, and there is no reason why the 14 companies should be forbidden to do so. This request is denied.

(B) From espionage on the business of any competitor, from bribery of employés of such competitor, and from obtaining information from any United States revenue official.

Why any one individual or corporation engaged in this business may not acquire such information as he or it can legitimately obtain from private or public sources as to the business of a competitor we fail to see. When illegitimate methods are proved, they may be dealt with. This request is denied.

(C) That every independent or other person interested should, in the event of any alleged violation of the injunction, have liberty to apply to the court for protection and for such action as may appear to be appropriate.

The result of such a provision would be to overwhelm the court with a multitude of applications, mainly frivolous. Any one who feels aggrieved should take his complaint to the Attorney General, who will winnow the wheat from the chaff. If he finds substance in any allegation, he can bring it before the court. This request is denied.

(D) It is requested that the majority stock of the Lipfort Scales Company, now owned by the R. J. Reynolds Tobacco Company, be sold, "with an injunction against any present stockholder in the Reynolds Company, in the American Company, or in any of the allied companies, from purchasing at such sale." A similar request for a sale, under like restrictions, is made as to the stock of five other companies now owned by the American Tobacco Company.

This request is denied for reasons set forth infra in discussing the disposition of the stock of the United Cigar Stores Company.

(E) The Attorney General of the state of New York suggests that the proposed plan may violate the anti-monopoly laws of this state. He does not indicate in what respect it will do so. We think it unnecessary to make any investigation on the line suggested. Our approval of this plan will not secure to these 14 companies immunity for violation of the laws of this or of any other state.

Referring next to the defendant the Imperial Tobacco Company, the Attorney General asks that the plan shall include provisions terminating all executory contracts or agreements between the Imperial Tobacco Company, on the one hand, and the American Tobacco Company and the British-American Tobacco Company and each and every of the corporations parties defendant hereto on the other; and also a provision enjoining the said American Tobacco Company from uniting with the British-American Tobacco Company in the employment of a common agent for the purchase of leaf tobacco in the United States, and from uniting with any of the corporations among which the properties and business now in the combination are to be distributed, in the employment of a common agent for the purchase of leaf tobacco or any of the products of tobacco.

These provisions, of course, should be restricted to such as affect trade or commerce between the states, or between the United States and foreign countries. We understand that the proposed plan in substance so provides; but, if there be any doubt as to its doing so, counsel may agree on the form of amendments which will insert these provisions.

The disposition of the United Cigar Stores Company has been discussed by most of the objectors. Those who represent the independents insist that it shall be split up into separate concerns, "preferably ten."

It is not one of the so-called accessory companies, and the Supreme Court has not directed that it be disintegrated. Upon the trial much testimony was taken as to this company, and the question whether or not it was a combination obnoxious to the provisions of the anti-trust act was carefully examined. We reached the conclusion, unanimously, that it was not. A succinct statement of our reasons for reaching that conclusion will be found in Judge Coxe's opinion (164 Fed. 700).

We therefore dismissed the bill as to that company. The Supreme Court, however, held that we erred in so doing, solely because the American Tobacco Company had bought and held two-thirds of its capital stock, which brought it into the general combination. Under the proposed plan all this stock held by the American Tobacco Company is to be distributed to its own common stockholders, and the sole ground upon which the Supreme Court reversed this court is thus removed. The situation will then stand as to all other grounds as it did before, and we see no reason to change the opinion expressed on the original hearing. No new evidence is offered except to the fact that it has in the interim largely increased the number of its stores. Such increase, however, leaves it in control of less than 4 per cent. of the entire business in which it is engaged. The request to disintegrate it is denied.

The Attorney General does not ask that it be disintegrated. He has, however, argued at length and with much earnestness that the continued growth of this enterprise affects the small retail dealer, who is without capital to compete with it and applies to the government to protect him. There may come a time when the growth of this company or the methods by which such growth is stimulated may bring it within the prohibition of the statute. But that time has not yet come, and the only request the Attorney General, in response to appeals for aid, has formulated is this: That the stock of the United Cigar Stores Company be sold and distributed to parties other than the 29 individual defendants or others of the common stockholders of the American Tobacco Company, to the end that the corporation be entirely separated from any connection with the corporations to which the properties and businesses now in the combination are to be distributed.

We have no power to grant any such request. The anti-trust act carefully enumerates the penalties for a violation of its provisions—fines, imprisonment, injunction against continuing to transact interstate business, treble damages to all persons injured by an unlawful combination, seizure, and forfeiture of property in course of interstate transportation. These are certainly ample to enforce obedience. By confiscation of property in transit and injunction against continuance in interstate business an offender may be put out of active existence into a state of paralysis as helpless as dissolution. It might be said that to these penalties the Supreme Court has added another, a qualified confiscation of property not in transit by receivership and forced sale. Nowhere, however, is there any authority for the proposition that this court may seize the property of private persons who may have offended against the statute and sell it under conditions which would preclude the holder of the title or the owner of the equity from bidding at the sale so as to compel the purchaser to pay a reasonable price for it, or from buying it himself if no one else will pay full value for it. That is confiscation; none the less so because the proceeds of such a sale, after paying outstanding debts and expenses, are to be turned over to the owner. Until Congress shall expressly give such power to this court, or until some obscure language in its grant of power shall be construed by the Supreme Court as in effect convey-

ing such power, this court is not prepared to assume that it possesses any such authority. The request is denied.

The Ludington Cigarette Machine Company, which has a decree for an accounting against the Anargyros Company, has applied for relief. The stock of the last-named company is by the plan to be transferred to P. Lorillard Company. The Ludington Company asks for the insertion of a provision which will secure it against any resulting difficulty on such accounting. Provision should be made in carrying out the plan for keeping intact the books and records of the American Tobacco Company, its present constituents and branches, so that they shall be available and subject to examination to the same extent as at present in suits for accounting and other existing litigation.

[3] The Attorney General further requests that there should be reserved to the government the right at any time within five years from date of entry to apply to the court for other and further relief upon a showing that as a matter of fact such plan has not resulted in creating a new condition which shall be honestly in harmony with and not repugnant to the law.

It is not apparent that this court has the power so to do. Had it not been for the mandate of the Supreme Court, it might be questioned whether a Circuit Court of the United States had any jurisdiction to recreate a new group of corporations out of the elements into which a pre-existing group of corporations had been split, or to formulate a plan or method according to which individuals, natural or corporate, were to be invited to invest money and embark in business. All such questions are, of course, resolved for us by the decision of the court of last resort. But neither in its mandate nor in its opinion is there any warrant for the conclusion that this court is to prescribe the temporary terms of a modus vivendi, with power to reassemble five years hence, ourselves or our survivors and successors, and modify those terms, while in the interim by purchase or exchange of these bonds upwards of $100,000,000 worth of property shall have changed hands irrevocably.

The only function assigned to us is to consider any proposed plan which responsible parties engage to carry out, and approve or reject it. In the event of rejection the only alternative is injunction, receivership, and sale. The time limit fixed in the mandate—six months, and possibly two more—precludes any other construction of its terms.

WARD, Circuit Judge, concurs.

COXE, Circuit Judge. I approve of the proposed plan, not because I think it perfect, but because it is the best plan attainable. Perfection is impossible. The condition existing before the illegal combination was formed cannot be restored; it has gone beyond the hope of recall. The plan which we have sanctioned eliminates the objectionable features prohibited by the anti-trust act, and permits no unreasonable or unlawful restraint of trade. In short, were the various corporations which the plan authorizes organized for the first time to-

day they would not be within the letter or the mischief of the statute. We have endeavored, while punishing the guilty defendants—corporations and individuals—to remember that the rights of many innocent bondholders and shareholders are at stake and should be protected as far as is consistent with a complete compliance with the requirements of the law. The plan disintegrates the combination, destroys the monopoly and liberates trade; but it accomplishes all this without a wanton destruction of property.

I have been impressed with the evident intention of counsel representing the various defendants to accept without reservation the result of the litigation and faithfully to carry out the plan, not only in letter but in spirit as well. Many suggestions have been advanced by counsel representing persons not parties to the suit, which, from an economic or ethical viewpoint are impeccable. When, however, it is remembered that we are acting only under the command of the Supreme Court, limited as to scope and time, it will be seen how powerless we are to make conditions favorable to the so-called "independents," when we can exact no reciprocal obligations from them. We are to ascertain and determine upon "some plan or method of dissolving the combination and of recreating out of the elements now composing it, a new condition which shall be honestly in harmony with and not repugnant to the law." This we can do, and when it is done our commission ends. The consideration which has the greatest weight with me is that no one has proposed a better plan, the only alternative offered being the appointment of a receiver—a receiver for corporations solvent and prosperous. I agree with the Attorney General that such a calamity should be avoided, except as a last resort. It is impossible to forecast the disaster which would follow such a step. It would wreck a flourishing business upon which an army of employés are depending for a livelihood; it would unsettle trade, and it would punish with equal severity the innocent and the guilty. More than this, I am by no means convinced that it would not produce the very evil which this action was instituted to destroy. A receiver can dispose of the property in his hands only by a judicial sale to the highest bidder, who will take title sanctioned by a decree of the court creating the receivership. In the present case, the men best equipped to make this bid are the very men who now control the condemned corporations. It is surely possible, if not probable, that the property might thus come under their control with a title which will render them immune from further prosecution.

For these reasons, thus briefly stated, I think that the plan, with the amendments directed by this court, should be adopted.

NOYES, Circuit Judge (concurring). The Supreme Court of the United States, after finding the illegality of this combination, placed the duty upon this court of hearing the parties "for the purpose of ascertaining and determining upon some plan or method of dissolving the combination and of recreating, out of the elements now composing it, a new condition which shall be honestly in harmony with and not repugnant to the law."

191 F.—25

And the Supreme Court added these words:

"In view of the considerations which we have stated, we leave the matter to the court below to work out a compliance with the law without unnecessary injury to the public or the rights of private property."

By these directions this court is required to enter into the examination of questions, economical as well as legal, and to depart from the function of determining existing controversies to that of deciding the legality of future proposed action. The duty imposed is extraordinary, because the Supreme Court in imposing it was dealing with an extraordinary situation.

The question was as to the relief to be afforded. A decree forbidding corporate stockholding would have been inadequate, because the combination was largely based upon property ownership. Original conditions could not be restored. Immediate extreme measures would have inflicted irreparable injury upon innocent interests. It was necessary to provide a method for determining in advance whether a proposed plan of disintegration would harmonize with the law, and hence the direction to this court.

The magnitude and varied nature of the assets of the combination, the extent of its liabilities, the ramifications of its business and the complexity of its affairs would make our duty difficult if we were required merely to apply rules of dissolution and recreation prescribed by the Supreme Court. But from the very intricacy of the case there are no rules. We are left without guide to turn a condition in violation of the law into a condition honestly in harmony with it. The only measure of the extent of rehabilitation required is the object to be attained. The evils found to exist alone indicate the measure required to meet them.

If, then, we approach the performance of our duty without an appreciation of the complexity of the problem and of the difficulties under which the formulators of any plan must labor, we will not go far. If we are not satisfied with a substantial compliance of the law, if we strain after the ideal and put aside the practicable, it will be easy to bring on a receivership with its attendant losses to innocent investors. But that result was what the Supreme Court was solicitous of avoiding, and, I think, intended that we should recognize the problem presented to us as a very practical one to be disposed of in a practical way. Moreover, in the performance of our duty we owe much to the Attorney General, who, while always insisting upon the rights of the public and by such insistence bringing the plan into its present shape has, nevertheless—as it has seemed to me—felt that he, too, owed a duty to protect innocent interests and not to cause ruin and disaster by forcing extreme measures which might, even from the public point of view, in the end produce no better results than those at hand, and possibly infinitely worse.

Taking up the plan, we know at the outset that it is an honest one. It has been built up almost in our presence, and whatever question there may be as to its merits, there is none of the good faith of its authors nor of the ability and conscientiousness with which they have performed their task.

The present combination has vast capitalization and assets. The corporations of the plan will have large capitalization and assets. Whether that is an objection should be considered.

The Supreme Court did not condemn the combination on account of the great amount of property which it had acquired. Indeed it must now be accepted that magnitude of business in and of itself does not constitute unlawful monopoly, at least up to the point where economy of production and management are thereby promoted. There must be something more—some unlawful or oppressive act or purpose in acquiring the business or after its acquisition—to come within the condemnation of the statute. But it cannot be denied that there is an enormous, inherent and collateral power incident to the holding by a single corporation of vast assets which no group of individuals, although having similar possessions, should obtain. There is such a potentiality of monopolization that a court in striving to bring about a condition in harmony with the law should hesitate to approve the existence of a producing corporation having vast assets not necessary for the work of production. Consequently when it appeared in the formulation of this plan that the American Tobacco Company was to receive from the other corporations over a hundred million dollars in cash and securities which it was required to hold to meet its indebtedness, but which it did not need in its business, the plan, notwithstanding many valuable features, seemed unacceptable. But meeting the objections of the Attorney General, a way was found—as shown in the plan—of appropriating those funds to the payment of debts so that the readjusted American Company—still the largest of all—will possess some one hundred millions of property— mostly working assets and brand values—as compared with the three hundred millions it formerly held. In view of modern commercial conditions, I think that the court should make no objection to the mere size of the corporations of the plan.

Taking up the question, then, whether the plan gives effect to the statute, the answer, as we have seen, depends upon whether it remedies the conditions found to violate the statute, and it is necessary to turn to the decision of the Supreme Court to find out those conditions.

Without examining the decision in detail, it is sufficient here to say that the court found broadly the combination to be in restraint of trade within the first section and an attempt to monopolize and a monopolization within the second section of the statute. In particular the court found among the bases for its conclusions: (a) Covenants of vendors and others binding themselves for long periods not to compete with the combination; (b) the absorption of the control of corporations supplying the elements essential to the manufacture of tobacco product and other corporate stockholding; (c) the existence of controlling "power in the hands of the few"; (d) the obtaining of control of the tobacco trade by wrongful and oppressive acts, agreements and arrangements.

Obviously, the evil of restrictive covenants must be met by the termination of such covenants and that is accomplished by the plan. It provides for the abrogation of all covenants made by vendor corpo-

rations, partnerships or individuals not to engage in the tobacco business, and for the termination of foreign restrictive covenants.

The evil of controlling the production of the elements essential to tobacco manufacture must be met by requiring the tobacco manufacturing corporations to be disconnected from the production of such elements. This seems to be fairly accomplished by the plan. The shares held by the combination in the corporation manufacturing tinfoil and the voting shares held in the corporation manufacturing licorice are to be distributed. When that is done, none of the tobacco manufacturing companies of the plan will have any legal domination over the production of those essentials. So the evil of corporate stockholding is met by divesting the American Company of any interest in the snuff business, in the retail cigar business, and of its shares in other important corporations.

The evils pointed out by the Supreme Court growing out of the existence of power in the hands of the few to control the combination must be met by the destruction of such power. This power had its basis in the holding of a majority of the voting shares of the American Company by the individual defendants in this suit. It is proposed to destroy this power by giving the preferred stock of the American Company, which has heretofore had no voting rights, full voting power by creating voting rights in the preferred shares of other corporations, and by so distributing shares that, in the language of the petition:

"No small group of men, nor even the 29 individual defendants in the aggregate, will own the control of any of the principal, accessory or subsidiary companies defendant, and the control of the American Tobacco Company itself and of the new companies to be formed will be vested in a body of more than six thousand stockholders."

In addition to these provisions this court, at the instance of the Attorney General, will guard against the acquisition by the defendants of control in the future by enjoining them from increasing their aggregate stockholdings.

With this additional provision I think the requirement that power of control be taken out of the hands of the individual defendants sufficiently met. It is true that while shorn of legal control they will own substantial minority interests in the different corporations, and that in the practical workings of the affairs of a corporation a minority interest through the inaction of the majority, may often control it. But the control of a corporation lies in the majority of its shares, and if we see that the legal control of those corporations is placed in other hands than those of the defendants I think we go far enough. In my opinion we are not called upon to guard against the possible failure of the majority to exercise its power.

The next inquiry is whether the plan fairly meets the evil of obtaining control of the tobacco trade by oppressive tactics as well as the broad conclusion of illegality. And my opinion is that it does in case, but only in case, the state of monopoly found to exist is ended by a division of business and a state of reasonable competitive business established.

This is the state of monopoly which now exists: The American Company, either directly or through its ownership of stock in other corporations, controls the manufacture of 75 per cent. of the smoking tobacco manufactured in the United States; 80 per cent. of the plug tobacco, 70 per cent. of the fine cut, 80 per cent. of the cigarettes, 13 per cent. of the cigars, 90 per cent. of the snuff, and 93 per cent. of the little cigars.

Broadly speaking, the proposed plan of disintegration is to divide the tobacco business among four corporations, no one of which is to have a controlling interest therein. When the disintegration is accomplished, the business will be so distributed that no company will have substantially over 40 per cent. in volume or value in any particular line. Furthermore, I am satisfied that there is to be a fair distribution of brands as well as of business.

Without examining the details of the plan, it is enough to say that careful study of it has convinced me that in so far as the distribution of business is concerned, sufficient has been done to end the state of monopoly and to establish reasonably competitive conditions. If practicable, it might have been more desirable to divide the business into a greater number of parts. But as the plan stands it cannot, in my opinion, be said that any of the corporations will have such preponderating influence in the tobacco industry as to give it power to control the market, either as manufacturer, seller or purchaser. The possibility of future acts of oppression is to be guarded against by a comprehensive injunction.

This brings us to the final question which is whether the fact of common stockholding is a material objection to the plan.

Obviously common ownership in the shares of the various corporations cannot well be avoided. Each stockholder of the American Company had an undivided interest in its property remaining after the payment of its debts. When its assets are distributed among stockholders each is entitled to his proportionate share. When such distribution takes the place of corporate shares the necessary result is a common ownership of stock in different corporations. I am not convinced that in the absence of statutory authority any division by valuation and allotment could be effected, and if legally possible it is evident that the complicated conditions which would necessarily arise in carrying it out would render it impracticable within the time prescribed by the Supreme Court for the disintegration of this combination.

The objection to mutual stockholding is not that competition is eliminated in principle. Potential competition necessarily exists. The same conditions do not continue indefinitely. Stockholders die and estates are divided. Differences of opinion upon values lead to sales and exchanges. Potential competition with an open market must fairly end in real competition. But the objection is to present and not future conditions, and, from an economic point of view, I have always thought it entitled to serious consideration. Manifest difficulties must attend the establishment of real competition between different corporations having the same body of stockholders. In the case of small

corporations having few stockholders who directly participate in their management they would be, perhaps, insuperable. They would decrease in proportion to the increase in the size of the corporation and the separation of the stockholders from the active management of their affairs, until—as I view it—in the case of the disintegration of a corporation having vast assets and a very large number of scattered stockholders they would be so minimized as hardly to warrant consideration even from an economic standpoint.

That which has made me pause in the present case is the concentrated common stockholding of the individual defendants. After careful consideration, however, I have reached the conclusion that that objection should not operate to prevent the acceptance of the plan, but should call for most rigorous measures of injunctive relief to keep the various corporations apart, independent and free from connections or arrangements to prevent competition. In reaching this conclusion I am influenced by the proposition stated at the outset that we should take care that we do not by seeking the ideal reject the practicable and put in peril innocent property interests, and I am controlled, as I view it, by the decisions of the Supreme Court in the Northern Securities and Standard Oil cases. It is impossible for me to read those decisions without being convinced that the Supreme Court in remanding this case to us did not intend that we should reject a plan upon the ground of pro rata distribution. I am also influenced, if not controlled, by the position taken by the Attorney General, the representative of the party plaintiff in the cause.

So, taking the plan as a whole, with the essential measures of injunctive relief proposed by the Attorney General, I think that it meets the principal evils pointed out in the opinion of the Supreme Court; that it brings about a condition fairly in harmony with the law, and that it is the duty of this court to approve it as the best solution possible under all the circumstances of a very difficult practical problem.

In conclusion: The extent to which it has been necessary to tear apart this combination and force it into new forms, with the attendant burdens, ought to demonstrate that the federal anti-trust statute is a drastic statute which accomplishes effective results; which, so long as it stands on the statute books must be obeyed, and which cannot be disobeyed without incurring far-reaching penalties. And, on the other hand, the successful reconstruction of this organization should teach that the effect of enforcing this statute against industrial combinations is not to destroy but to reconstruct; not to demolish but to recreate in accordance with the conditions which the Congress has declared shall exist among the people of the United States.

I concur in the opinion of Judge LACOMBE, and fully approve his disposition of the subjects not considered in this opinion.

### NOTE.

The present American Tobacco Company was organized under the laws of the state of New Jersey. Either directly or through its ownership of stock in other companies, it controls the production of 75 per cent. of smoking tobacco manufactured in the United States, 80 per cent. of plug tobacco, 79 per cent. of fine cut, 80 per cent. of cigarettes, 13 per cent. of cigars, 90 per cent. of snuff, and 93 per cent. of little cigars. Through its ownership of

two-thirds of the stock of the Conley Tin Foil Company it has a large control over the tin foil business. By its stockholding in the American Snuff Company it exercises a controlling influence in the snuff business. Through its ownership of the stock of MacAndrews & Forbes it dominates the business of manufacturing licorice paste. By reason of its ownership of two-thirds of the ordinary shares of the British-American Company it has a controlling position in trade with and in foreign countries. Its control of two-thirds of the stock of the Porto Rican-American Tobacco Company makes it the most influential factor in the manufacture of Porto Rican tobacco. Because of its ownership of two-thirds of the stock of the United Cigar Stores Company it is an important factor in the retail tobacco trade.

The American Tobacco Company has an outstanding issue of 6 per cent. debenture bonds of $52,882,650, an outstanding issue of 4 per cent. debenture bonds of $51,354,100, $78,689,000 of 6 per cent. preferred stock, and $40,-260,400, of common stock. Of the common stock the 29 individual defendants, who were adjudged by the Supreme Court to be parties to the illegal combination, own about 56 per cent., while the great majority of the preferred stock, which has never had voting rights, is owned by the public.

The Supreme Court having declared this combination of corporations and individuals, engaged in the manufacture and sale of tobacco and its related products, to be illegal, because in restraint of trade and an attempt at monopolization, directed the Circuit Court for the Southern District of New York to hear the parties for the purpose of devising some plan or method of dissolving the combination, and of recreating out of the elements composing it a new condition in harmony with the law, but without unnecessary injury to the public or the rights of private property.

The plan now proposed undertakes to disintegrate the combination and to restore lawful conditions, by dividing the businesses in tobacco and related products heretofore dominated and controlled by the American Tobacco Company, or by companies in which it has held a large or controlling interest, among 14 separate and independent companies; no one of them having control of or dominance in the trade as to any of the products manufactured by it, no one of them having any dominance or controlling position as to purchase of raw material of any kind, whether of the several types of leaf tobacco or otherwise, no one of them having any interest by way of ownership of stock or otherwise in any other of them, and each of them being a company, whether now existing or to be created under the plan, in which the American Tobacco Company will have no interest.

This disintegration will be accomplished by one or the other of the following methods: (1) By distributing by way of dividends, to the stockholders entitled thereto, securities of other companies held by the companies sought to be disintegrated. (2) By forming one or more new companies and selling thereto a substantial part of the property and, business of the company sought to be disintegrated, in return for securities of such new company or companies, and distributing such securities by way of dividends to the stockholders entitled thereto out of the surplus of the company to be disintegrated. (3) By the sale of property and business for cash. (4) By forming a new company or new companies and selling thereto a substantial part of the property and business of the company to be disintegrated, for cash and for new securities to be offered in exchange for and retirement of the securities of the vendor company. (5) By terminating all restrictive covenants not to engage in the tobacco trade, whether with corporations or individuals, and whether affecting domestic or foreign trade, thus releasing a large number of persons and corporations from their present obligation not to engage in the tobacco trade, and removing all obstacles in the way of those who desire to re-enter it. (6) By radical changes in the voting rights of stock, so that the individual defendants will no longer in the aggregate have control of any company in the tobacco business or any related business.

Inasmuch as the American Tobacco Company, denominated the "principal defendant," and the five companies, to wit, American Snuff Company, American Cigar Company, American Stogie Company, MacAndrews & Forbes Company, and the Conley Foil Company, denominated "accessory defendants," are held each to constitute in and of itself a combination in restraint of trade,

the plan provides for the disintegration of each of these six companies by the disposition by each of them of a substantial part of its property and business. In addition to this disintegration of the American Tobacco Company and the five accessory companies, many other companies, denominated "subsidiary companies," are to be wholly separated from the principal and accessory companies by one or other of the methods above indicated.

### The American Tobacco Company.

The American Tobacco Company, so far as its domestic tobacco business is concerned, is to be divided into four companies, no one of which will have a controlling influence in the tobacco business. The four companies are the American Tobacco Company (the present company), Liggett & Myers Tobacco Company (to be organized), the P. Lorillard Company (to be organized), and the R. J. Reynolds Tobacco Company (an existing corporation). When the disintegration is accomplished the volume and value of the business in the several branches of tobacco manufacture will be divided between the four companies as follows:

| | Percentage in Volume (Lbs. or Thousands.) | Percentage in Value. |
|---|---|---|
| **Cigarettes.** | | |
| American Tobacco Co. | 37.11 | 33.15 |
| Liggett & Myers. | 27.82 | 21.03 |
| Lorillard Co. | 15.27 | 26.02 |
| Others never in any way connected with the combination | 19.80 | 19.80 |
| **Smoking Tobacco.** | | |
| American Tobacco Co. | 33.08 | 40.53 |
| Liggett & Myers. | 20.05 | 16.47 |
| Lorillard Co. | 22.82 | 18.88 |
| Reynolds Tobacco Co. | 2.66 | 2.73 |
| Others never in any way connected with the combination | 21.39 | 21.39 |
| **Plug Tobacco.** | | |
| American Tobacco Co. | 25.32 | 22.98 |
| Liggett & Myers. | 33.83 | 37.84 |
| Lorillard Co. | 3.73 | 4.64 |
| Reynolds Tobacco Co. | 18.07 | 15.49 |
| Others never in any way connected with the combination | 19.05 | 19.05 |
| **Fine Cut Tobacco.** | | |
| American Tobacco Co. | 9.94 | 13.52 |
| Liggett & Myers. | 41.61 | 36.26 |
| Lorillard Co. | 27.80 | 29.57 |
| Others never in any way connected with the combination | 20.65 | 20.65 |
| **Cigars.** | | |
| American Cigar Co. | 6.06 | 8.90 |
| Lorillard Co. | 5.72 | 2.88 |
| American Stogie Co. | 1.58 | 1.58 |
| Others never in any way connected with the combination | 86.64 | 86.64 |
| **Little Cigars.** | | |
| American Tobacco Co. | 15.43 | 13.41 |
| Liggett & Myers. | 43.78 | 38.69 |
| Lorillard Co. | 33.84 | 40.95 |
| Others never in any way connected with the combination | 6.95 | 6.95 |

The disintegration is brought about by selling $115,000,000 of the property of the American Tobacco Company, consisting of factories, brands, businesses, and capital stock of tobacco manufacturing companies, to Liggett & Myers Tobacco Company and P. Lorillard Company for cash and securities of the two vendee companies, and by distributing to the common stockholders of the American Tobacco Company the two-thirds of the stock of the R. J. Reynolds Tobacco Company now owned by the American Tobacco Company.

The capitalization of Liggett & Myers and P. Lorillard Companies, respectively, will be as follows:

|  | Liggett & Myers. | Lorillard. | Total. |
|---|---|---|---|
| 7% bonds | $15,507,837 | $10,933,488 | $26,441,325 |
| 5% bonds | 15,059,589 | 10,617,461 | 25,677,050 |
| 7% preferred stock | 15,383,719 | 10,845,981 | 26,229,700 |
| Common stock | 21,496,354 | 15,155,571 | 36,651,925 |
|  | $67,447,499 | $47,552,501 | $115,000,000 |

The securities of the Liggett & Myers Tobacco Company and P. Lorillard Company will be paid to the American Tobacco Company as the consideration for the conveyances by it. The common stock of the new companies will be sold for cash at par to the common stockholders of the American Tobacco Company, thus making what is in the nature of an assessment of $36,651,925 on the common stock of the American Tobacco Company. This sum will be used for the retirement and cancellation of existing bonds at par of the American Tobacco Company.

Each 6 per cent. bondholder of the American Tobacco Company will be offered 120 in cash for half his holdings, and for the other half 7 per cent. bonds at par, in the aggregate, of the Liggett & Myers and Lorillard Companies. Each 4 per cent. bondholder of the American Tobacco Company will be offered 96 for half his holdings, and for the other half 5 per cent. bonds at par, in the aggregate, of the Liggett & Myers and Lorillard Companies. Each preferred stockholder of the American Tobacco Company will be offered the right to exchange one-third of his holdings at par into 7 per cent. preferred stock of the Liggett & Myers and Lorillard Companies.

The effect of these changes, when made, will be to pay off the entire bonded debt of the American Tobacco Company, amounting to $104,236,750, and to reduce its assets correspondingly. It will be left with $52,459,400 of preferred stock and $40,260,400 of common stock, as its only outstanding securities. The preferred stock will be given full voting rights, and the control of the American Tobacco Company will thus pass from the 29 individual defendants to the holders of $92,701,800 preferred and common stock.

Both the preferred stock of Liggett & Myers and Lorillard Companies will also have full voting rights, and the 29 defendants will control neither of these companies. The same will be true of the R. J. Reynolds Tobacco Company. None of the four companies, the American Tobacco Company, Liggett & Myers, Lorillard Company, and the Reynolds Company, will have any interest in or relation to the other, although at the outset they will of necessity have many stockholders in common.

### The American Snuff Company.

The American Tobacco Company now holds nearly half of the shares of the stock of the American Snuff Company. Such influence as this stock-holding gives to the American Tobacco Company will be terminated, and the Snuff Company itself will be disintegrated into three companies by the following method:

There will be organized two new snuff companies, one to be called the George W. Helme Company, and the other Weyman & Bruton Company. The American Snuff Company will convey to these two companies, respectively, manufacturing assets consisting of factories and brands, so that the resulting division of the snuff business will be in volume as follows:

American Snuff Co..................................... 32.05 per cent.
George W. Helme Co................................. 30.88 "      "
Weyman & Bruton Co.............................. 29.23 "      "

And in value as follows:-

American Snuff Co..................................... 35.55 " "
George W. Helme Co.................................. 28.95 " "
Weyman & Bruton Co................................ 27.68 " "

Each of these vendee companies will pay for the property and business conveyed to it by the issue of $4,000,000 at par of 7 per cent. voting preferred stock and $4,000,000 at par of common stock, all of which will go into the treasury of the American Snuff Company. It will thereupon distribute to its common stockholders as a dividend the common stock of both the new companies, aggregating $8,000,000, charging it to surplus account. It will offer to its preferred stockholders proportionately these 7 per cent. preferred stocks of the new companies in exchange for the preferred stock of the American Snuff Company at par. So much of the preferred stock of the American Snuff Company as is thus exchanged will be retired. So much of the preferred stocks of the new companies as are not exchanged will be disposed of by the American Snuff Company.

The American Tobacco Company, being a holder of the common stock of the American Snuff Company, will participate in the distribution above provided, and will in turn distribute the common stocks of the Helme Company and the Weyman & Bruton Company, together with its present holdings of American Snuff common and preferred stock to its common stockholders.

The result of this disintegration of the Snuff Company will be that there will be three companies engaged in the production of snuff, none of which will have any dominating position in the snuff trade, and none of which will have any interest in or relation to the other. Such control as the American Tobacco Company has over the Snuff Company will pass away from it, and also from the 29 individual defendants..

### The Conley Foil Company.

The American Tobacco Company owns more than half of the stock of the Conley Foil Company, engaged in the business of manufacturing tin foil used for the most part by tobacco manufacturers. The Conley Foil Company, whose plant is in New York, owns all the stocks and bonds of the Johnston Tin Foil & Metal Company, which has a plant in St. Louis. The Conley Foil Company will distribute its holdings of the securities of the Johnston Tin Foil & Metal Company, to wit, 3,000 shares of stock, all of one class, and $100,000 of bonds, to its stockholders. The American Tobacco Company, being a stockholder of the Conley Foil Company, will participate in the distribution, and will in turn distribute its dividend, together with its stock in the Conley Foil Company, to its common stockholders. The result will be that the control of the American Tobacco Company over the tin foil business will terminate, and there will be two tin foil companies in which the American Tobacco Company has no interest, and which will have no interest in or relation with each other. The control of these companies will not be in the 29 individual defendants, but in the hands of present individual stockholders of the Conley Foil Company, and common stockholders of American Tobacco Company.

### The Licorice Company.

The American Tobacco Company owns a majority of the capital stock of the MacAndrews & Forbes Company, a corporation engaged in manufacturing licorice paste, which is an essential ingredient in plug tobacco. The MacAndrews & Forbes Company has two plants, one at Camden, N. J., and the other at Baltimore, Md., and produces about 90 per cent. of all the licorice paste manufactured in the United States, but over 50 per cent. of its product consists of a single brand, known as the "Ship" brand. The MacAndrews & Forbes Company will be divided into two companies in the manner following:

There will be organized a company, to be known as the J. S. Young Company, and the MacAndrews & Forbes Company will convey to it the Baltimore factories and brands, taking in payment $1,000,000 7 per cent. preferred and $1,000,000 common stock of the Young Company. The annual output

of the Young Company will be $1,201,000. The MacAndrews & Forbes Company will have an annual output of $2,514,000, of which $2,214,000 will be in the "Ship" brand. The common stock of the Young Company will be distributed as a dividend to the common stockholders of the MacAndrews & Forbes Company.

The American Tobacco Company, as a stockholder of the MacAndrews & Forbes Company, will share in the distribution of the Young Company's common stock, and will in turn distribute it, together with the common stock which it now holds in the MacAndrews & Forbes Company, to its common stockholders. The preferred stock of the Young Company will be offered in exchange for an equal amount of the preferred stock of MacAndrews & Forbes Company—any of the latter thus exchanged to be retired, and any of the preferred stock of the Young Company not thus taken up by exchange to be sold.

The result will be two licorice companies, having no interest in or relation to each other, and the American Tobacco Company will have no interest in either of them. The control which the American Tobacco Company now has over these companies will pass to the individual stockholders of the MacAndrews & Forbes Company and the common stockholders of the American Tobacco Company, but will no longer be held by the 29 individual defendants.

### The Cigar Company.

The American Cigar Company is not a dominant factor in the cigar trade of the United States, for it represents not more than 15 per cent. of the cigar business. But, nevertheless, it is to be disintegrated as follows:

It will part with its interest in the American Stogie Company, and the American Stogie Company itself will be dissolved. It will sell to the American Tobacco Company for cash all its interest in the Porto Rican-American Tobacco Company, and the American Tobacco Company will distribute the stock so acquired, together with its own stock in the Porto Rican-American Tobacco Company, to its common stockholders. The American Cigar Company will also sell a substantial part of its domestic business, carried on under the name of the Federal Cigar Company, to the American Tobacco Company for cash. The American Tobacco Company in turn will sell this business to the P. Lorillard Company for securities, being a part of the consideration paid by the Lorillard Company for the property conveyed to it by the American Tobacco Company, as stated above.

The result of the disintegration will be that the Porto Rican-American Tobacco Company will be completely divorced from the control of the American Tobacco Company and the American Cigar Company, neither of which will have any interest in it. It will not be controlled by the 29 individual defendants, and a large part of the business of the American Cigar Company will pass to the P. Lorillard Company, which will have no interest in or relation to the American Cigar Company.

### The Foreign Companies.

The Imperial Tobacco Company of Great Britain and Ireland, the American Tobacco Company, and the American Cigar Company, one of its accessory companies, and the British-American Tobacco Company, Limited, are now bound together by contracts, which forbid the Imperial Tobacco Company from doing business in the United States, except buying leaf tobacco, the American Tobacco Company and the American Cigar Company from competing with the Imperial Company in England, and both the Imperial Tobacco Company and the American Tobacco Company from competing with the British-American Tobacco Company in foreign countries. These contracts will be terminated, leaving each company free to hereafter compete in the territory of the other. The shares of the British-American Company, amounting to two-thirds of the ordinary shares, now held by the American Tobacco Company, will be distributed to its common stockholders.

The result will be that the control of the American Tobacco Company over the British-American Tobacco Company will cease, and these companies will hereafter have no interest in or relation to each other. As the Imperial Tobacco Company now owns one-third of the ordinary shares of the British-

American Company, the control of the British-American Company will pass to the Imperial Company, and to the common stockholders of the American Tobacco Company, but not to the 29 individual defendants.

### The United Cigar Stores Company.

The American Tobacco Company now owns two-thirds of the stock of the United Cigar Stores Company. It is proposed to distribute these shares to the common stockholders of the American Tobacco Company.

The result will be that the American Tobacco Company will have no further control over the United Cigar Stores Company, nor will these two companies have any interest in each other. The control of the United Cigar Stores Company will pass to its present individual stockholders and the common stockholders of the American Tobacco Company, but, in view of the fact that one-third of its stock is held by persons not connected with the American Tobacco Company, it will not be in the hands of the 29 individual defendants.

The petition itself summarizes the results of the disintegration as follows:

"The tin foil business now done and controlled by the Conley Foil Company will be divided into two companies having no interest whatsoever the one in the other, and neither in a dominant position with respect to the tin foil business. The licorice business now done and controlled by MacAndrews & Forbes Company will be divided into two companies, with no interest in nor connection with each other, and neither in a dominant position in the licorice business. American Stogie Company will be dissolved, and its business disintegrated. The business of American Cigar Company will be disintegrated, and it will have no dominant position in any branch of the cigar business. The snuff business now done and controlled by American Snuff Company will be divided into three companies, American Snuff Company itself and two other companies to be organized, and none of the three will have any interest in nor connection with either of the others.

"The American Tobacco Company, through distribution out of its surplus, will have denuded itself of any interest in, or control over, the tin foil business, the licorice business, and the snuff business. It will have stripped itself of any interest in or control over R. J. Reynolds Tobacco Company, a company manufacturing and selling tobacco in the Southern states. It will have completely severed all relations with the Porto Rican-American Tobacco Company, manufacturing and selling cigarettes and cigars in Porto Rico, and selling in the United States cigars manufactured in Porto Rico. It will have divested itself of all interest in or association with British-American Tobacco Company, Limited, and the Imperial Tobacco Company (of Great Britain and Ireland), Limited. It will have parted with all its interest in United Cigar Stores Company, a company engaged in the retail distribution of cigars and tobacco.

"The American Tobacco Company itself, as an operating company, will be broken into three companies, each completely equipped for the conduct of a large tobacco business, neither of which will own any interest in any other, and neither of which will be dominant in the tobacco trade, whether reference be had to proportion of sales in any branch of the business, or regard be had to dominating ownership of popular and valuable brands, or regard be had to purchase of any type of leaf tobacco, or regard be had to any other measure of importance in the tobacco trade.

"All covenants that prevent the American Tobacco Company from extending its business abroad, or British-American Tobacco Company, Limited, or the Imperial Tobacco Company (of Great Britain and Ireland), Limited, from extending their business in the United States, will be terminated, and each will be free to engage in business throughout the world. All covenants not to engage in the tobacco business, made by vendors or others, will be terminated, leaving all free to engage in any branch of the tobacco business. Thus the business in tobacco and related products heretofore controlled by the American Tobacco Company, or by companies in which it owns a controlling or large interest, will not only be completely divorced from such control, but will be distributed among 14 separate and independent companies, none of which will have any control over or interest in any other, and none of which

will have any preponderating influence in any branch of the business, either as a manufacturing company, a selling company, or as a purchaser of any type of leaf tobacco.

"Finally, no small group of men, nor even the 29 individual defendants in the aggregate, will own the control of any of the principal, accessory, or subsidiary companies defendant, and the control of the American Tobacco Company itself and of the new companies to be formed will be vested in a body of more than 6,000 stockholders."

This plan involves the disposition by the American Tobacco Company of stocks, factories, brands, and other property earning a net annual income, based on actual results in 1910, $22,593,312.16. The total cost to the common stockholders, the American Tobacco Company, of putting into effect this plan of disintegration, including the increased interest and preferred dividend charges capitalized on a 5 per cent. basis, the payment of bonds at above par, the expenses of the disintegration itself, and the organization of new companies, will amount to at least $22,000,000. This amount is permanently taken from the common stockholders, in addition to the $36,651,925 in cash that they will pay and that will be used in paying off the bonds of the company in order to reduce its size.

PETITION OF THE AMERICAN TOBACCO COMPANY AND ALL THE OTHER DEFENDANTS TO THE ABOVE-ENTITLED CAUSE, EXCEPT THE IMPERIAL TOBACCO COMPANY (OF GREAT BRITAIN AND IRELAND), LIMITED, UNITED CIGAR STORES COMPANY, AND R. P. RICHARDSON, JR., & CO., INCORPORATED.

To the Honorable the Circuit Judges, Sitting in the Southern District of New York:

Your petitioners respectfully show unto the court:

### I. PRELIMINARY STATEMENT.

The above-entitled cause is a suit in equity brought in this court by the United States of America against the corporate and individual defendants thereto under the act of Congress of July 2, 1890, known as the "Sherman Anti-Trust Law," to enjoin the alleged violation of that statute by the defendants, and proceeded from this court by appeal to the Supreme Court of the United States, which latter court remanded the cause to this court, with directions that this court hear the parties by evidence, or otherwise, for the purpose of ascertaining and determining upon some plan or method of dissolving the combination found to exist among the defendants, and of recreating out of the elements now composing it a new condition which would be honestly in harmony with, and not repugnant to, the law, without unnecessary injury to the public or the rights of private property.

Your petitioners accordingly have prepared such a plan or method.

Inasmuch as the American Tobacco Company, denominated the "principal defendant," and five companies, to wit, American Snuff Company, American Cigar Company, American Stogie Company, MacAndrews & Forbes Company, and the Conley Foil Company, denominated "accessory defendants," are held each to constitute in and of itself a combination in restraint of trade, such plan or method provides for the disintegration of each of said six companies by the disposition by each of them of a substantial part of its property and business, but not for the dissolution of any of said corporations (except American Stogie Company).

This disposition of property and disintegration is to be accomplished by one or the other of the following methods—in some instances one method is adopted, and in some instances two or more of such methods—to wit:

(a) By distributing by way of dividends to the stockholders entitled thereto securities of other companies held by the company sought to be disintegrated.

(b) By forming one or more new companies and selling thereto a substantial part of the property and business of the company that is to be disintegrated, in return for securities of such new company or companies, and distributing such securities by way of dividends to the stockholders entitled thereto, out of the surplus of the company to be disintegrated.

(c) By the sale of property and business for cash.

(d) By forming a new company or new companies, ánd selling thereto a. substantial part of the property and business of the company to be disintegrated for cash, and for new securities to be offered in exchange and retirement of securities of the vendor company.

In addition to this disintegration of the American Tobacco Company and the five accessory companies, many other companies, denominated "subsidiary companies," are to be wholly separated from the principal and accessory companies by one or other of the methods just indicated.

All restrictive covenants not to engage in the tobacco trade, whether with corporations or individuals,. and whether affecting domestic or foreign trade, are to be terminated.

Radical changes in the voting rights of stocks are to be made, so that the individual defendants will no longer in the aggregate have control of any company engaged in the tobacco business, or any related business.

## II. PLAN.

Petitioners therefore herewith submit the following plan, whereby the business in tobacco and related products heretofore dominated and controlled by the American Tobacco Company, or by companies in which it has held a controlling or large-interest, will 'be divided up between, and carried on by, 14 separate and independent companies; no one of them having control of, or dominance in, the trade as to any of the products manufactured by it, no one of them having any dominance or controlling position as to purchase of raw material of any kind, whether of the several types of leaf tobacco or otherwise, no one of them having any interest by way of ownership of stock, or otherwise, in any of the others, and each of them being a company, whether now existing or to be created under the plan, in or with which the American Tobacco Company will have no interest or connection:

### A. Dissolution of Amsterdam Supply Company.

Amsterdam Supply Company is a company engaged in the business of purchasing, for a commission or brokerage, supplies, other than leaf tobacco; its principal customers being defendant corporations herein. It has $235,000 at par of stock, all held in varying amounts by certain corporation defendants, one or the other of your petitioners, and a surplus of $127,058.74.

It is proposed that Amsterdam Supply Company be dissolved, converting its assets into cash, and distributing them to its stockholders.

### B. Abrogation of Foreign Restrictive Covenants.

Under the contracts of September 27, 1902, the Imperial Tobacco Company and certain of its directors agreed not to engage in the business of manufacturing or selling tobacco in the United States, the American Tobacco Company and American Cigar Company and certain of their directors agreed not to engage in the business of manufacturing or selling tobacco in Great Britain and Ireland, and the American Tobacco Company, American Cigar Company, and the Imperial Tobacco Company agreed not to engage in the business of manufacturing or selling tobacco in countries other than Great Britain and Ireland and the United States. Under the provisions of this contract British-American Tobacco Company, Limited,· was organized and took over the export businesses of the American Tobacco Company and the Imperial Tobacco Company, with factories, materials, and supplies.

It is proposed that the covenants herein just described be terminated, so that each of the companies and their directors be free to engage in any kind of tobacco business, whether the purchase of leaf, the manufacture of tobacco, or the sale of tobacco, anywhere in the world, just as if said covenants had not been made, and that the contracts be altogether terminated so far as they impose any obligation upon any of the parties thereto to furnish or to refrain from furnishing manufactured tobacco to any party, each company to treat as its own the brands and trade-marks which by said contracts it has license to use; the said license having been perpetual, and constituting, in effect, a conveyance of the brands and trade-marks used, for the countries in which they were so used, by each of the companies licensees as aforesaid.

## C. *Abrogation of Domestic Restrictive Covenants.*

It is proposed that covenants given by vendor corporations, partnerships, or individuals, or by stockholders of vendor corporations, to vendee corporations defendants herein, not to engage in the tobacco business, be terminated, so that all such covenantors shall be at liberty to engage in the business of buying, manufacturing, and dealing in tobacco and its products just as if such covenants had not been made.

## D. *Disintegration of Accessory Companies.*

### (1) The Conley Foil Company.

The Conley Foil Company has a capital stock of $825,000 at par, all of one class, of which the American Tobacco Company owns $495,000 at par; the balance being held by persons not defendants, nor connected with defendants. It is engaged in the business of manufacturing tin foil, a product used largely by tobacco manufacturers, but having other uses as well. The Conley Foil Company has a plant in New York City, and it owns all the stock and bonds of the Johnston Tin Foil & Metal Company, which has a plant in St. Louis. The value of the output for the year 1910 of the Conley Foil Company was $1,780,526.85, with a net profit of $273,299.82, and the Johnston Tin Foil & Metal Company had an output for the year 1910 of the value of $676,520.05, and net profits of $66,255.16. On December 31, 1910, the Conley Foil Company had tangible assets (excluding its securities of the Johnston Tin Foil & Metal Company) of $1,215,321, and the Johnston Tin Foil & Metal Company had assets of the value of $379,802.11. The Conley Foil Company has a surplus exceeding the value of the securities of the Johnston Tin Foil & Metal Company.

It is proposed that the Conley Foil Company distribute its holdings of the securities of the Johnston Tin Foil & Metal Company, to wit, 3,000 shares of stock, all of one class, and $100,000 of bonds, to its stockholders.

The American Tobacco Company, being a stockholder of the Conley Foil Company, will participate in this distribution, and will in turn distribute its dividend, as well as its stock in the Conley Foil Company, to its common stockholders as hereinafter set forth.

### (2) MacAndrews & Forbes Company.

MacAndrews & Forbes Company is a company having a common capital stock of $3,000,000 at par, of which the American Tobacco Company owns $2,112,900 at par, the balance being held by persons not defendants nor connected with defendants (except less than 3½ per cent. of the common stock held by R. J. Reynolds Tobacco Company), and $3,758,300 at par of 6 per cent. nonvoting preferred stock, of which the American Tobacco Company holds $750,000 at par, the balance being held by persons not defendants nor connected with defendants. It is engaged in the production of licorice paste, with two plants, one at Camden, N. J., and the other at Baltimore, Md. It had tangible assets, December 31, 1910, of the value of $5,683,824.89 (including $2,118,448.36, licorice root, with plants for its collection in foreign countries), and its sales for the year 1910 were of the value of $4,427,023.44. MacAndrews & Forbes Company succeeded to the business MacAndrews & Forbes, a partnership, who were pioneers in this country in the production of licorice paste, and who had, for many years before any acquisitions of other business, and before they had any connection with the other defendants herein, more than 50 per cent. of all the licorice paste business of the United States.

It is proposed that a new corporation be organized, called the J. S. Young Company, and that it shall acquire the Baltimore plant of MacAndrews & Forbes Company, with the assets used therein and in connection therewith, of a total value of $1,000,000, and the brands of licorice paste manufactured in said Baltimore plant; that it issue in payment therefor, with the good will connected therewith, $1,000,000 at par of 7 per cent. preferred nonvoting stock, and $1,000,000 at par of common stock; that MacAndrews & Forbes Company distribute the common stock of the J. S. Young Company as a dividend to its common stockholders, charging the amount thereof to its surplus account; that MacAndrews & Forbes Company offer to its preferred stock-

holders proportionately to exchange the 7 per cent. preferred stock of the J. S. Young Company at par for their preferred stock of MacAndrews & Forbes Company; that, so far as the preferred stock of MacAndrews & Forbes Company is thus exchanged, it be retired; that, so far as this preferred stock of the J. S. Young 'Company is not forthwith thus exchanged, MacAndrews & Forbes Company be enjoined from using it to exercise, or otherwise exercising or attempting to exercise, influence or control over the J. S. Young Company; and with the further provision that on or before January 1, 1915, the whole of this preferred stock of the J. S. Young Company, not theretofore taken out of the treasury of MacAndrews & Forbes Company by exchange as aforesaid, be disposed of by MacAndrews & Forbes Company.

This would give to MacAndrews & Forbes Company a licorice business, including Spanish licorice and powdered goods, of the net selling value, based upon the year 1910, of $2,514,184.64, of which $2,214,127.51 arise from sales of one brand, to wit, the old "Ship" brand. The J. S. Young Company, upon the basis of the business for the year 1910, would have an output of the net selling value of $1,201,109.86.

The American Tobacco Company, being a holder of the common stock of MacAndrews & Forbes Company, will participate in the distribution above provided, and will in turn distribute its dividend, as well as its stock in MacAndrews & Forbes Company, to its common stockholders as hereinafter set forth.

### (3) American Snuff Company.

American Snuff Company is a manufacturer of snuff. It holds all of the stock of De Voe Snuff Company, to wit, $50,000 at par, and one-half, to wit, $26,000 at par, of the stock of National Snuff Company. It owns no other interest in any company manufacturing or selling snuff.

It is proposed that there be organized two new snuff companies, one to be called the George W. Helme Company, and the other Weyman & Bruton Company, and that American Snuff Company convey to these two companies, respectively, factories, with the brands manufactured in them, as follows: To the George W. Helme Company, the factories at Helmetta, N. J., and Yorklyn, Del., except factory No. 5; to Weyman & Bruton Company, the factories at Chicago and Nashville, also all the stock of De Voe Snuff Company, and the one-half of the stock of National Snuff Company, held by American Snuff Company. Based upon the business for the year 1910 and the assets at the end of the year, with proper provision for leaf, materials, cash, and book accounts for the two vendee companies, this would leave the three companies equipped as follows:

#### Manufacturing Tangible Assets.

| | |
|---|---|
| American Snuff Company | $5,075,969.72 a |
| George W. Helme Company | 4,909,000.40 |
| Weyman & Bruton Company | 3,691,588.20 |

#### Sales Value During 1910.

| | |
|---|---|
| American Snuff Company | $5,520,422.15 |
| George W. Helme Company | 4,494,556.66 |
| Weyman & Bruton Company | 4,297,486.71 |

#### Net Income.

| | |
|---|---|
| American Snuff Company | $1,591,280.49 a |
| George W. Helme Company | 1,259,280.98 |
| Weyman & Bruton Company | 1,293,759.39 |

Each of these vendee corporations will pay for the property and business conveyed to it by the issue of $4,000,000 at par of 7 per cent. voting preferred

---

a American Snuff Company holds securities not connected with the snuff business, to wit, stock and bonds of the American Tobacco Company, and preferred stock of American Cigar Company, aggregating in book value $2,530,216.69, upon which American Snuff Company received in interest and dividends during the year 1910 $176,680. It is proposed that American Snuff Company sell or otherwise dispose of these securities within three years, and that in the meantime they be held under an injunction as is provided in this paragraph with respect to securities of the George W. Helme Company and Weyman & Bruton Company to be temporarily held by it. It also owns all, to wit, $100,000 at par, of the stock of Garrett Real Estate Company, which will be dissolved and liquidated.

stock, and $4,000,000 at par of common stock. American Snuff Company will thus receive the $16,000,000 at par of these stocks into its treasury, and will distribute to its common stockholders, as a dividend, the common stock, aggregating $8,000,000, to be charged to its surplus account. American Snuff Company will offer to its preferred stockholders proportionately to exchange these 7 per cent. preferred stocks of the George W. Helme Company and the Weyman & Bruton Company for their preferred stock of American Snuff Company at par. So much of the preferred stock of American Snuff Company as is thus exchanged will be retired. As to so much of the preferred stocks of the George W. Helme Company and the Weyman & Bruton Company as is not forthwith thus exchanged, American Snuff Company to be enjoined from voting it, or using it to exercise, or otherwise exercising, or attempting to exercise, influence or control over the George W. Helme Company or the Weyman & Bruton Company, and on or before January 1, 1915, all of these preferred stocks of the George W. Helme Company and the Weyman & Bruton Company, not theretofore taken out of the treasury of American Snuff Company by exchange as aforesaid, to be disposed of by American Snuff Company.

The American Tobacco Company, being a holder of the common stock of American Snuff Company, will participate in the distribution above provided, and will, in turn, distribute its dividend, as well as its stock in American Snuff Company, including that to be acquired from P. Lorillard & Company, to its common stockholders as hereinafter set forth.

### (4) American Stogie Company.

American Stogie Company is a corporation whose only asset is all of the issued stock of Union-American Cigar Company, which latter company has cigar factories located at Pittsburgh, Allegheny, Lancaster, and Newark. Its total production, based upon business for the year 1910, is only 1.58 per cent. of the entire production of cigars in the United States in volume, and, as these petitioners believe, about the same percentage in value. American Stogie Company has $976,000 at par of 7 per cent. cumulative preferred stock, of which American Cigar Company owns $40,000 at par, and none of the other defendants own any. It has $10,879,000 at par of common stock, of which American Cigar Company owns $7,303,775 at par, and none of the other defendants own any. There are accumulated and unpaid dividends on the preferred stock to the amount of $399,000 as of December 31, 1910.

It is proposed that American Stogie Company dissolve, with leave granted to the trustees in dissolution to either convert the assets into cash, and distribute them among the stockholders according to their rights, or to effect such reorganization as they may be able to effect, provided, that in either event there shall be a separation into at least two different ownerships of the factories and businesses now owned and operated by Union-American Cigar Company. If the dissolution is followed by a conversion of the assets of American Stogie Company into cash. American Cigar Company will take such cash as it may receive into its treasury. If it receives upon such dissolution securities of cigar manufacturing concerns, it will distribute such as a dividend to its common stockholders, to be charged to its surplus as hereinafter set forth.

### (5) American Cigar Company.

American Cigar Company is a manufacturer of cigars. It has various factories of its own, and it owns all or a part of the stock of several companies engaged in the manufacture of cigars, all of which companies have been organized by it, and which have received from it conveyances of part of its business, operating in this way as separate corporations for trade purposes. Among these companies is Federal Cigar Company.

American Cigar Company also owns a part of the stock of Havana Tobacco Company, which controls factories manufacturing cigars in Havana, a part of the stock of Porto Rican-American Tobacco Company, engaged in the manufacture of cigars and cigarettes in Porto Rico, and half of the stock of Porto Rican Leaf Tobacco Company, engaged in growing tobacco in Porto Rico. American Cigar Company itself uses large quantities of Porto Rican

191 F.—26

grown leaf. Neither American Cigar Company nor any of the companies in which it is interested, except Havana Tobacco Company and Porto Rican-American Tobacco Company, is engaged in the manufacture of cigars outside of the United States.

American Cigar Company, including with its production the production of companies of which it owns in whole or in part the stock, has, in volume, based on the business for the year 1910, 13.36 per cent. of the cigar business of the United States, and in value, as your petitioners believe, substantially the same percentage. Havana Tobacco Company has, directly or indirectly, control of 24.06 per cent. of the total production of cigars in Cuba, 46.00 per cent. of the total exportation of cigars from Cuba to all countries of the world, including the United States, and 38.15 per cent. of the total exportation of cigars from Cuba to the United States.

It is proposed that American Cigar Company dispose of properties belonging to it, and thus disintegrate its business, as follows:

(a) That it sell to the American Tobacco Company, for cash, its stock, being all thereof, of Federal Cigar Company, at a fair price, to wit, $3,965,-616.05.

(b) That it sell to the American Tobacco Company, for cash, the stock it owns of Porto Rican-American Tobacco Company, to wit, $657,000 at par, at a fair price, to wit, $350 per share, or $2,301,600.

(c) That American Cigar Company dispose of any interest in American Stogie Company by receiving cash proceeds of its stock in dissolution thereof, if American Stogie Company upon dissolution converts its assets into cash, or by distributing as a dividend to its common stockholders out of its surplus the securities which it receives upon the dissolution of American Stogie Company, if it receives such.

All stocks thus to be acquired by the American Tobacco Company from American Cigar Company are to be disposed of by the American Tobacco Company as hereinafter set out.

*E. Distribution by the American Tobacco Company of Stocks Owned or to be Acquired by It.*

#### (1) Immediate Distribution of Stocks.

The American Tobacco Company will buy from P. Lorillard Company, for cash at par, the 11,247 shares of the preferred stock of American Snuff Company held by P. Lorillard Company, and will receive, as the sole common stockholder of P. Lorillard Company, and by way of dividends, 34,594 shares of the common stock of American Snuff Company held by P. Lorillard Company.

The American Tobacco Company will distribute among its common stockholders by way of dividends, and to be charged to its surplus, all of its securities of the following described classes, whether now owned by it or bought by it from American Cigar Company, as hereinbefore set forth, or bought by it from P. Lorillard Company, as just hereinbefore set forth, or received by it by way of dividends from any of the accessory companies defendant, as hereinbefore set forth, to wit:

American Snuff Company common stock.
American Snuff Company preferred stock.
George W. Helme Company common stock.
Weyman & Bruton Company common stock.
MacAndrews & Forbes Company common stock.
J. S. Young Company common stock.
The Conley Foil Company stock.
The Johnston Tin Foil & Metal Company stock and bonds.
R. J. Reynolds Tobacco Company stock.
United Cigar Stores Company stock.
British-American Tobacco Company, Limited, ordinary shares.
Porto Rican-American Tobacco Company stock.

American Stogie Company stock (or what is received by way of dividends from American Cigar Company upon dissolution of American Stogie Company).

Including the amount to be paid to American Cigar Company and P. Loril-
lard Company for such of these securities as are to be acquired by the Amer-
ican Tobacco Company from them respectively, and excluding those to be ac-
quired by way of dividends, and which, therefore, do not affect the surplus
of the American Tobacco Company, never having been set up on its books,
these securities had a book value as of December 31, 1910, of $35,011,865.03.
The earning capacity of all the above securities thus to be distributed, based
upon the results of the year 1910, is $9,860,410.76, though not all thereof was
distributed as dividends.

### (2) Deferred Disposition of Stocks.

The American Tobacco Company will sell, or otherwise dispose of, or dis-
tribute by way of dividends to its common stockholders out of its surplus at
the time existing, before January 1, 1915, all of its holdings of the following
securities:

British-American Tobacco Company, Limited, nonvoting preference shares.
The Imperial Tobacco Company (of Great Britain and Ireland), Limited, or-
dinary shares.
United Cigars Stores Company bonds.
MacAndrews & Forbes Company nonvoting preferred stock.
During the time these securities are left in the treasury of the American
Tobacco Company, the American Tobacco Company to be enjoined from voting
any thereof that under the terms thereof might be voted, or using any there-
of to exercise, or otherwise exercising or attempting to exercise, influence or
control over the said companies which issued the said securities, respectively,
and from gaining possession of any of the said companies by buying in at a
foreclosure had under any of the securities, for any default with respect there-
to or otherwise.

*F. Sale by the American Tobacco Company of Manufacturing Assets and
Business to Companies to be Formed.*

### (1)

There will be organized a new corporation called "Liggett & Myers Tobacco
Company," and a new corporation called "P. Lorillard Company," and the
American Tobacco Company will sell, assign, and convey to these two compa-
nies factories, plants, brands, and businesses, and capital stocks of tobacco
manufacturing corporations, as shown in Exhibit A hereto attached; each of
these conveyances to include proper and adequate storage houses, leaf tobac-
co, and other materials and supplies, provision for book accounts, including in
each case a ratable proportion of the cash held by the American Tobacco
Company on December 31, 1910, so that each of the new corporations will be
fully equipped for the conduct of the business of manufacturing and dealing
in tobacco.

### (2) Resources and Capitalization of Companies and Provisions for Exchanging and Retiring Securities of American Tobacco Company.

The American Tobacco Company has securities issued and outstanding as
follows:

6% bonds ................................................................$52,882,650
4% bonds (including outstanding 4% bonds of Consolidated To-
bacco Company)........................................................ 51,354,100
6% preferred stock..................................................... 78,689,100
Common stock.......................................................... 40,242,400

The American Tobacco Company, in October, 1904, immediately after the
merger, had an outstanding issue of its own 4 per cent. bonds and the Con-
solidated Tobacco Company 4 per cent. bonds which it assumed, amounting
to $78,689,100, but it has purchased on the market and retired $27,335,000 at
par of these 4 per cent. bonds, charging the amount thus expended to sur-
plus. The 6 per cent. bonds and 4 per cent. bonds aforesaid are what are
ordinarily known as "debenture bonds," and are issued under a trust inden-
ture which imposes a general charge on the property, income, and earnings
of the company in favor, first, of the 6 per cent. bonds, and, second, of the 4

per cent. bonds. The American Tobacco Company, after the reduction of the surplus through the acquisition by it of 4 per cent. bonds as aforesaid, had on December 31, 1910, a surplus of $61,119,991.63, which will be increased by the surplus earnings of the current year. The distribution of securities herein provided for to be forthwith made would diminish the said surplus by $35,-011,865.03, the book value of securities to be so distributed. This book value is less than actual value; but, in view of the fact that none of the assets of the American Tobacco Company are overvalued, the advance of the book value of the securities to be distributed as hereinbefore set forth to their actual value would operate at the same time to increase the surplus of the company, and so its surplus, after such distribution, would remain just the same as though the advance to actual value had not been made on the books of the company.

The properties to be conveyed to the Liggett & Myers Tobacco Company and P. Lorillard Company, based upon conditions as of December 31, 1910, the last completed year, including in such conveyances the proper and proportionate storage houses, leaf tobacco, supplies and materials, and cash, but without anything for value of brands, trade-marks, formulæ, recipes, and good will, are of the value of $30,607,261.96 to Liggett & Myers Tobacco Company, and $28,091,748.86 to P. Lorillard Company. So far as these conditions shall be changed before the day of the conveyance, any deficiency is to be made good in cash, so that these two companies will have said amounts in tangible assets, useful, and such as have been used, in the manufacture of the brands to be conveyed to them, respectively, and cash. The American Tobacco Company will be left with tangible assets, employed in manufacturing tobacco and its products, cash, and bills and accounts receivable, of the value of $53,408,-498.94 as of December 31, 1910. The profits earned during the year 1910 on the brands and businesses to be conveyed by the American Tobacco Company to Liggett & Myers Tobacco Company amounted to $7,468,172.02, and the profits on the brands and businesses to be conveyed by the American Tobacco Company to P. Lorillard Company amounted to $5,264,729.38.

It is proposed that the value of the brands, trade-marks, recipes, formulæ and good will to be sold to each of these companies, be determined by their earning capacity, based upon the results for the year 1910, so that each shall have an earning capacity of 11.02 per cent. per annum upon its total property, including both tangible property and brand value and good will. Upon this basis the consideration to be paid by the Liggett & Myers Tobacco Company will be $30,607,261.96, value of tangible assets as above stated, and $36,840,-237.04, value of brands, trade-marks, recipes, formulæ and good will, making a total of $67,447,499; and the consideration to be paid by the P. Lorillard Company will be $28,091,748.86, value of tangible assets as above stated, and $19,460,752.14, value of brands, trade-marks, recipes, formulæ and good will, making a total of $47,552,501. The brands, trade-marks, recipes, formulæ and good will of the American Tobacco Company, on December 31, 1910, were of the book value of $101,324,964.07. The payments for brand value, etc., to the American Tobacco Company to be made by Liggett & Myers Tobacco Company and P. Lorillard Company as aforesaid, makes an aggregate of $56,300,989.18, and would thus leave the book value of brands, trade-marks, recipes, formulæ and good will retained by the American Tobacco Company at $45,023,-974.89, which added to the $53,408,498.94 of tangible manufacturing assets to be retained by the American Tobacco Company, will make the total book value of manufacturing property to be retained by that company $98,432,-473.83, upon which its earnings, based upon the results for the year 1910, would be $11,369,809.82, or 11.55 per cent.

The Liggett & Myers Tobacco Company and the P. Lorillard Company would pay for these conveyances, therefore, the aggregate as aforesaid, to wit:

Liggett & Myers Tobacco Company.............................. $67,447,499
P. Lorillard Company......................................... 47,552,501

Aggregating ...............................................$115,000,000

—or each with its earnings on the business for the year 1910 so capitalized that said earnings represent 11.02 per cent. upon the capital.

Liggett & Myers Tobacco Company and P. Lorillard Company will issue securities to cover such capitalization in the aggregate as follows: To an amount equal to one-half of the outstanding 6 per cent. bonds of the American Tobacco Company, that is, $26,441,325 at par in 7 per cent. bonds; to an amount equal to one-half of the outstanding 4 per cent. bonds of the American Tobacco Company, that is, $25,677,050 at par in 5 per cent. bonds; to an amount equal to one-third of the outstanding preferred stock of the American Tobacco Company, that is, $26,229,700 at par, in 7 per cent. cumulative voting preferred stock—which, upon liquidation of the company, shall be paid at par with accrued unpaid dividends, before any amount shall be paid to common stock, with balance of assets distributable ratably to the common stock, and the balance of said $115,000,000, that is, $36,651,925 in common stock, the 7 per cent. bonds and the 5 per cent. bonds to mature at the time fixed respectively for the maturity of the 6 per cent. bonds and the 4 per cent. bonds of the American Tobacco Company now outstanding, and to be issued under an indenture of substantially like tenor and terms with the present indenture of the American Tobacco Company under which its 6 per cent. bonds and 4 per cent. bonds were issued, the 7 per cent. bonds to have priority in charge over the 5 per cent. bonds in the same way that the 6 per cent. bonds of the American Tobacco Company have priority of charge over the 4 per cent. bonds. Thus the capitalization of the Liggett & Myers Tobacco Company and P. Lorillard Company will be as follows:

|  | Liggett & Myers. | Lorillard. | Total. |
|---|---|---|---|
| 7% bonds | $15,507,837 | $10,933,488 | $26,441,325 |
| 5% bonds | 15,059,589 | 10,617,461 | 25,677,050 |
| 7% preferred stock | 15,383,719 | 10,845,981 | 26,229,700 |
| Common stock | 21,496,354 | 15,155,571 | 36,651,925 |
|  | $67,447,499 | $47,552,501 | $115,000,000 |

All of these securities of the Liggett & Myers Tobacco Company and the P. Lorillard Company to be turned over to the American Tobacco Company in payment of the purchase price for the factories, plants, brands, and businesses and capital stocks of tobacco manufacturing corporations so to be conveyed to Liggett & Myers Tobacco Company and P. Lorillard Company, respectively, as hereinbefore set out.

These securities will be disposed of by the American Tobacco Company as follows:

The common stock will be offered for cash at par to the holders of the common stock of the American Tobacco Company in proportion to their holdings, and any not purchased by the person thus entitled thereto shall be sold to persons other than the individual defendants, to the end that such offer of common stock of the two new companies to the common stockholders of the American Tobacco Company shall not be used by the individual defendants to increase their ownership therein beyond the proportion of their holdings of the common stock of the American Tobacco Company.

To each holder of the 6 per cent. bonds of the American Tobacco Company an offer shall be made to acquire his bonds for cancellation, and to give in exchange therefor, as to one half thereof, new 7 per cent. bonds of Liggett & Myers Tobacco Company and P. Lorillard Company at par, and in payment for the other half thereof cash at the rate of $120 and accrued interest for each $100 face value of the bonds.

To each holder of the 4 per cent. bonds of the American Tobacco Company an offer shall be made to acquire his bonds for cancellation, and to give in exchange therefor, as to one half thereof, new 5 per cent. bonds of Liggett & Myers Tobacco Company and P. Lorillard Company at par, and, in payment for the other half thereof cash at the rate of $96 and accrued interest for each $100 face value of the bonds.

To each holder of the preferred stock of the American Tobacco Company an offer shall be made to acquire one-third of his stock for cancellation in exchange for an equal amount at par of Liggett & Myers Tobacco Company and P. Lorillard Company.

On account of the larger capitalization of the Liggett & Myers Tobacco Company as compared with the P. Lorillard Company, each class of the new securities will issue in the proportion of 58.65 per cent. thereof of Liggett & Myers Tobacco Company securities and 41.35 per cent. thereof of P. Lorillard Company securities. The stocks will be issued in shares of $100, and coupon bonds in denominations of $1,000, and registered bonds in larger denominations, and in denominations of $100 and $50, and in actual issue fractions will be eliminated.

The common stocks of the two companies aforesaid are to be sold as above set out prior to March 1, 1912, with three years to be allowed for the retirement of the bonds and preferred stock of the American Tobacco Company, as above set out. Pending such, the said 7 per cent. bonds, 5 per cent. bonds, and 7 per cent. preferred stocks of the Liggett & Myers Tobacco Company and the P. Lorillard Company, together with an amount in cash, or in securities owned by the American Tobacco Company, at their book value, or partly in cash and partly in such securities, equal to the amounts required if all such sales and exchanges are made, will be deposited with the Guaranty Trust Company of New York, the trustee in the indenture under which the 6 per cent. bonds and the 4 per cent. bonds of the American Tobacco Company are issued, as the agency to effect the purchase and exchange. Such deposit will be made, not to secure, nor create a trust fund for, the bonds, but for the purpose of sequestrating and taking from the control of the American Tobacco Company the securities and cash so deposited. During the time of such deposit the securities shall be in the name of, as well as in the custody of, said Trust Company, with any voting rights attaching thereto, but the American Tobacco Company shall receive from the Trust Company all dividends and interest collected by it on account of such securities; and the American Tobacco Company shall have the right at any time and from time to time to sell, at such price as it may determine, and direct the delivery of any of such securities (except the securities of Liggett & Myers Tobacco Company and P. Lorillard Company), the consideration therefor to go into the hands of said Trust Company, or to withdraw any of such securities (except the securities of Liggett & Myers Tobacco Company and P. Lorillard Company) for the purpose of distribution among its common stockholders, if its surplus at the time permits, or to substitute other securities of like book value for the securities so deposited (except as to the securities of Liggett & Myers Tobacco Company and P. Lorillard Company), or to alter the relative proportion of cash and securities; it being the intent of this provision that there shall be sequestrated from the control of the American Tobacco Company all the securities of the Liggett & Myers Tobacco Company and P. Lorillard Company, and an additional amount of cash or other securities equal, upon the purchase basis aforesaid, to the value of the 4 per cent. bonds and the 6 per cent. bonds of the American Tobacco Company at the time outstanding. At the end of the three years, if there are any of such securities of the Liggett & Myers Tobacco Company or P. Lorillard Company in the hands of such trust company undisposed of by such exchange as aforesaid, then the American Tobacco Company shall apply to this court for an order as to the disposition thereof. Nothing contained in this provision, and nothing done under this provision, shall be construed as providing for the creation of, or as creating, any lien or security on anything deposited with the trust company in favor of the 6 per cent. bonds or the 4 per cent. bonds of the American Tobacco Company outstanding. or otherwise.

### G. Voting Rights to Preferred Stock.

By proper amendment of the certificate of incorporation of the American Tobacco Company, the preferred stock will be given full voting rights.

### H. Certain Incidental Provisions.

#### (1)

P. Lorillard Company is a New Jersey Company, with $3,000,000 of common stock, all of which is owned by the American Tobacco Company, and $2,000,000 of 8 per cent. preferred stock. Of this preferred stock the American Tobacco Company holds $1,596,100 at par, and there is held by others $403,900.

at par. Under the laws of New Jersey the present P. Lorillard Company may be dissolved by the holders of two-thirds of the outstanding stock, and upon such dissolution the preferred stock is entitled to be paid at par; the balance of the assets going to the common stock. In view of the fact, however, that the preferred stock of the present P. Lorillard Company is an 8 per cent. preferred stock, with abundant assets and earnings to make the principal and income secure, it is deemed fair to the holders of this outstanding $403,900 of preferred stock that they be given an opportunity to take, at their option, either cash at par, which they are legally entitled to, or the 7 per cent. preferred stock of the proposed new P. Lorillard Company. As the preferred stock of the new P. Lorillard Company is to be a 7 per cent. preferred stock, the holders of said $403,900 of said present preferred stock will be offered stock of the new company at the rate of $114.25 for each share. It is therefore proposed that the new P. Lorillard Company provide for an additional amount of preferred stock sufficient to take care of $403,900 preferred stock on that basis, to wit, $114.25 in new 7 per cent. preferred stock for each $100 of said stock, amounting to $461,600 at par of preferred stock, in addition to that set out hereinbefore. In view of the fact that in the statements hereinbefore made as to earnings of the P. Lorillard Company there is included only such part of the earnings of the present P. Lorillard Company as accrued to the proportion of its stock held by the American Tobacco Company, this increase of preferred stock would increase proportionately the profits of the P. Lorillard Company, and does not derange any of the figures hereinbefore given, or given in any of the exhibits hereto and hereinafter referred to.

(2)

American Snuff Company manufactures and sells a brand of snuff called "Garrett," which has a large sale in the Southern and Southwestern sections of the country. Originally this brand was manufactured at Yorklyn, Del., and in part packed in Philadelphia. Several years ago American Snuff Company determined, on account of freight rate conditions, to manufacture this brand at Clarksville, Tenn., and to pack it at Memphis, Tenn., and that the factories at Yorklyn, Del., should be given up to the manufacture of other brands. It has yet, though, been unable to produce in Clarksville, Tenn., goods similar to the goods heretofore and now made by it at Yorklyn, Del., although the experiment is still in progress, and with hope of success. Under the plan hereinbefore outlined, the brand "Garrett" snuff is allotted to American Snuff Company, and the factories other than one factory at Yorklyn, Del., are allotted to George W. Helme Company. Your petitioners pray that, in the approval and adoption by this court of this plan, American Snuff Company and George W. Helme Company be permitted to manufacture brands the one for the other, for a period not exceeding one year from March 1, 1912, each company paying to the other, as consideration for such manufacture, the cost thereof plus 5 per cent. The necessity of paying 5 per cent. above cost is sufficient inducement to each company to manufacture its own goods as soon as American Snuff Company is able to manufacture "Garrett" snuff of the requisite character and kind in its Clarksville factory, thus leaving the Yorklyn factories, other than No. 5, for the manufacture by the George W. Helme Company of its own brands.

### III. Exhibits Showing Results.

The foregoing plan and method, based upon the allotment of brands and businesses herein provided and shown in Exhibit A hereto, and the volume and value of the business on these brands for the year 1910, will divide the tobacco business of the United States in all its branches, as shown by Exhibit B hereto attached.

The American Tobacco Company, Liggett & Myers Tobacco Company, P. Lorillard Company, and the R. J. Reynolds Tobacco Company will have property, as of December 31, 1910, and based upon the business for the year 1910, will have an annual net selling value of products, and net profits all as shown on Exhibit C hereto attached.

The distribution of factories and principal brands among the three companies will be as shown on Exhibit D hereto attached.

The distribution of purchases of different types of tobacco based upon the business of each company for the year 1910, with the estimated average aggregate of the entire production of these types, is shown on Exhibit E hereto attached.

The relative ownership of voting stocks held by the 29 individual defendants in the aggregate, and held by those not defendants nor in any way connected with the defendants, is as shown on Exhibit F hereto.

### IV. RESULTS OF ADOPTION OF PLAN.

Your petitioners show unto the court that upon the adoption and execution of this plan the combination heretofore adjudged to exist will have been effectually dissolved, and out of the elements heretofore composing the same a new condition, which will be honestly in harmony with and not repugnant to the law, will have been brought about as follows:

The tin foil business now done and controlled by the Conley Foil Company will be divided into two companies having no interest whatsoever the one in the other, and neither in a dominant position with respect to the tin foil business.

The licorice business now done and controlled by MacAndrews & Forbes Company will be divided into two companies, with no interest in or connection with each other, and neither in a dominant position in the licorice business.

American Stogie Company will be dissolved, and its business disintegrated.

The business of American Cigar Company will be disintegrated, and it will have no dominant position in any branch of the cigar business.

The snuff business now done and controlled by American Snuff Company will be divided into three companies. American Snuff Company itself and two other companies to be organized, and none of the three will have any interest in or connection with either of the others.

The American Tobacco Company, through distribution out of its surplus, will have denuded itself of any interest in, or control over, the tin foil business, the licorice business, and the snuff business.

It will have stripped itself of any interest in or control over R. J. Reynolds Tobacco Company, a company manufacturing and selling tobacco in the Southern states.

It will have completely severed all relations with the Porto Rican-American Tobacco Company, manufacturing and selling cigarettes and cigars in Porto Rico, and selling in the United States cigars manufactured in Porto Rico.

It will have divested itself of all interest in or association with British-American Tobacco Company, Limited, and the Imperial Tobacco Company (of Great Britain and Ireland), Limited.

It will have parted with all its interest in United Cigar Stores Company, a company engaged in the retail distribution of cigars and tobacco.

The American Tobacco Company itself, as an operating company, will be broken into three companies, each completely equipped for the conduct of a large tobacco business, neither of which will own any interest in any other, and neither of which will be dominant in the tobacco trade, whether reference be had to proportion of sales in any branch of the business, or regard be had to dominating ownership of popular and valuable brands, or regard be had to purchase of any type of leaf tobacco, or regard be had to any other measure of importance in the tobacco trade.

All covenants that prevent the American Tobacco Company from extending its business abroad, or British-American Tobacco Company, Limited, or the Imperial Tobacco Company (of Great Britain and Ireland), Limited, from extending their business in the United States, will be terminated, and each will be free to engage in business throughout the world.

All covenants not to engage in the tobacco business made by vendors or others will be terminated, leaving all free to engage in any branch of the tobacco business.

Thus the business in tobacco and related products heretofore controlled by the American Tobacco Company, or by companies in which it owns a con-

trolling or large interest, will not only be completely divorced from such control, but will be distributed among 14 separate and independent companies, none of which will have any control over or interest in any other, and none of which will have any preponderating influence in any branch of the business, either as a manufacturing company, a selling company, or as a purchaser of any type of leaf tobacco.

Finally, no small group of men, nor even the twenty-nine individual defendants in the aggregate, will own the control of any of the principal, accessory, or subsidiary companies defendant, and the control of the American Tobacco Company itself and of the new companies to be formed will be vested in a body of more than 6,000 stockholders.

### V.

That the difficulties and possible delays in securing the amendments of charters, formation of new companies, issuance of new securities, preparation of bonds and trust indentures, conveyances, deliveries, and adjustments of factory conditions, with the details incident to complete compliance with the internal revenue laws, are such that the necessities of the situation, in the judgment of your petitioners, require an extension of the period for the full accomplishment of the purposes contemplated and provided for by the mandate of the Supreme Court of the United States, and for the putting into operation the plan hereby proposed, and that such extension be for the full period permitted by the opinion of the Supreme Court of the United States, to wit, 60 days from the expiration of 6 months from receipt of the mandate from the Supreme Court of the United States, or until March 1, 1912.

Wherefore your petitioners pray:

1. That this court accept and approve the plan and method set forth in section III of this petition.

2. That this court extend until March 1, 1912, the time within which your petitioners shall carry out said plan.

3. That, should unforeseen difficulties arise in the execution of said plan, your petitioners have leave to apply to the court for such modification of the plan or other relief as may be necessary, if any.

4. That all persons be enjoined from in any way interfering with the carrying out of said plan.

5. That petitioners have other and further relief as may be proper and just in the premises.

W. W. Fuller,
Lewis Cass Ledyard,
De Lancey Nicoll,
Junius Parker,
Of Counsel for Petitioners.

State of New York, City and County of New York—ss.:

James B. Duke, being duly sworn, says: That he is president of the American Tobacco Company, one of the petitioners aforesaid. That he has read the foregoing petition, and that the statements therein are true to the best of his information and belief; the ground thereof being as follows: The statements made in said petition and the exhibits thereto are the result of investigation made at the direction of affiant in his capacity as president of the American Tobacco Company, said investigation being of the books and records of the American Tobacco Company and other defendant petitioners in which the American Tobacco Company directly or indirectly owns an interest. That to the best of your affiant's knowledge or belief these records have been accurately kept, and the statements, computations, figures, and values are truly shown from said record. That your affiant makes this affidavit instead of the American Tobacco Company, because the American Tobacco Company is a corporation. That your affiant has been its president, in constant acquaintance with its business and affairs. . . . . . . . . . . . .

Sworn to and subscribed before me this ——— day of October, 1911.
. . . . . . . . . . . .

State of New York, City and County of New York—ss.:

George W. Yates, being duly sworn, says: That he is an accountant in the employ of the American Tobacco Company; that he is, and has for several years been, in charge of the statistics of the company and the companies in

which it is directly or indirectly interested; that in the line of his duty affiant has regularly received from the auditing department of the various companies figures showing the result of the operation of such companies, values of property held by them, output of goods made by them, profits made by them, consumption of supplies and materials, and other information necessary or desirable in order to make easy the ascertainment from week to week of the business and financial condition of such companies and their different departments; that he has, under the direction of the president and other officers of the American Tobacco Company, gotten from his records and otherwise the figures set out or referred to that form the basis of the allegations of the foregoing petition and the exhibits thereto; that he has read the foregoing petition and the exhibits thereto; and that the allegations thereof are true according to his best information and belief.        ............

Sworn to and subscribed before me this ——— day of October, 1911.
............

### *Exhibit A.*

Factories, Plants, Brands, and Business, and Capital Stock of Tobacco Manufacturing Corporations to be Conveyed by the American Tobacco Company to Liggett & Myers Tobacco Company and P. Lorillard Company.

To Liggett & Myers Tobacco Company:

Liggett & Myers branch of the American Tobacco Company, engaged in the manufacture of plug tobacco at St. Louis, with the brands connected therewith.

Spaulding & Merrick, a company of which the American Tobacco Company owns, and has always owned, all the stock, engaged in Chicago in the manufacture of fine cut tobacco and smoking tobacco.

Allen & Ginter branch of the American Tobacco Company, engaged in the manufacture of cigarettes at Richmond, Va., and the brands connected therewith (this does not include the brand "Sweet Caporal," made partly there and partly at New York).

Chicago branch of the American Tobacco Company, a factory at Chicago engaged in the manufacture of smoking tobacco, with the brands connected therewith.

Catlin branch of the American Tobacco Company, a factory at St. Louis engaged in the manufacture of smoking tobacco, with the brands connected therewith.

Nall & Williams Tobacco Company, a company of which the American Tobacco Company owns all the stock, engaged in the manufacture of plug and smoking tobacco at Louisville, Ky.

The John Bollman Company, a company engaged in the manufacture of cigarettes at San Francisco. Of this corporation the American Tobacco Company owns 90 per cent. of the stock, which it is proposed to turn over to the Liggett & Myers Tobacco Company.

Pinkerton Tobacco Company, a corporation engaged in the manufacture of scrap tobacco (a kind of smoking tobacco) at Toledo, Ohio. Of this corporation the American Tobacco Company owns 77½ per cent. of the stock, which it is proposed to turn over to the Liggett & Myers Tobacco Company.

W. R. Irby branch of the American Tobacco Company at New Orleans, engaged in the manufacture of cigarettes and smoking tobacco; the principal brands being "Home Run" and "King Bee."

The Duke-Durham branch of the American Tobacco Company, engaged in the manufacture of cigarettes and smoking tobacco at Durham, N. C.; principal cigarette brands, "Piedmont" and "American Beauty"; principal smoking tobacco brand, "Duke's Mixture."

Two little cigar factories located, the one at Philadelphia, and the other at Baltimore, branches of the American Tobacco Company; principal brand, "Recruits."

To P. Lorillard Company:

All the rights of the American Tobacco Company in the present P. Lorillard Company, to wit, all the common stock and $1,596,100 at par out of a total issue of $2,000,000 of 8 per cent. preferred stock. It is contemplated that as a part of these reorganizations the Lorillard Company, as at present con-

stituted, be wound up and the new company be organized, taking over assets of the P. Lorillard Company.

S. Anargyros, a company engaged in the manufacture of cigarettes, in which the American Tobacco Company owns all the stock, and of which it has always owned all the stock.

Luhrman & Wilbern Tobacco Company, a company engaged in the manufacture of scrap tobacco (a kind of smoking tobacco), of which the American Tobacco Company owns, and has for many years owned, all the stock.

Philadelphia branch B at Philadelphia, Wilmington branch B at Wilmington, Penn Street Branch at Brooklyn, Danville branch B at Danville, and Ellis branch B at Baltimore, branches of the American Tobacco Company manufacturing little cigars; the principal brand being "Between the Acts."

Federal Cigar Company, a company all of whose stock is, and has always been, owned by American Cigar Company, but which, as hereinbefore provided, is to be purchased for cash by the American Tobacco Company.

### Exhibit B.

Division of Tobacco Business of United States, in All Branches, According to Volume and Value.

| | Percentage in Volume (Lbs. or Thousands) | Percentage in Value |
|---|---|---|
| **Cigarettes.** | | |
| American Tobacco Co. | 37.11 | 33.15 |
| Liggett & Myers | 27.82 | 21.03 |
| Lorillard Co. | 15.27 | 26.02 |
| Others never in any way connected with the combination | 19.80 | 19.80 |
| **Smoking Tobacco.** | | |
| American Tobacco Co. | 33.08 | 40.53 |
| Liggett & Myers | 20.05 | 16.47 |
| Lorillard Co. | 22.82 | 18.88 |
| Reynolds Tobacco Co. | 2.66 | 2.73 |
| Others never in any way connected with the combination | 21.39 | 21.39 |
| **Plug Tobacco.** | | |
| American Tobacco Co. | 25.32 | 22.98 |
| Liggett & Myers | 33.83 | 37.84 |
| Lorillard Co. | 3.73 | 4.64 |
| Reynolds Tobacco Co. | 18.07 | 15.49 |
| Others never in any way connected with the combination | 19.05 | 19.05 |
| **Fine Cut Tobacco.** | | |
| American Tobacco Co. | 9.94 | 13.52 |
| Liggett & Myers | 41.61 | 36.26 |
| Lorillard Co. | 27.80 | 29.57 |
| Others never in any way connected with the combination | 20.65 | 20.65 |
| **Cigars.** | | |
| American Cigar Co. | 6.06 | 8.90 |
| Lorillard Co. | 5.72 | 2.88 |
| American Stogie Co. | 1.58 | 1.58 |
| Others never in any way connected with the combination | 86.64 | 86.64 |
| **Snuff.** | | |
| American Snuff Co. | 32.05 | 35.55 |
| Helme Company | 30.88 | 28.95 |
| Weyman & Bruton | 29.25 | 27.68 |
| Others never in any way connected with the combination | 7.82 | 7.82 |
| **Little Cigars.** | | |
| American Tobacco Co. | 15.43 | 13.41 |
| Liggett & Myers | 43.78 | 38.69 |
| Lorillard Co. | 33.84 | 40.95 |
| Others never in any way connected with the combination | 6.95 | 6.95 |

## Exhibit C.

**Assets, Annual Net Selling Value, and Net Profits of the American Tobacco Company, Liggett & Myers, P. Lorillard Company, and R. J. Reynolds Tobacco Co.**

### The American Tobacco Company.

| | |
|---|---:|
| Net tangible assets | $53,408,498.94 |
| Trade-marks, brands, etc. | 45,023,974.89 |
| Investment securities | 40,098,870.37 |
| Cash to be received for common stocks of Liggett & Myers and P. Lorillard | 36,651,925.00 |
| 7% bonds of L. & M. and P. L. Co | 26,441,325.00 |
| 5% bonds of L. & M. and P. L. Co | 25,677,050.00 |
| | $227,301,644.20 |

| | | |
|---|---:|---:|
| Less 7% bonds to be exchanged for ½ Am. Tob. Co. 6% bonds | $26,441,325.00 | |
| ½ Am. Tob. Co. 6% bonds to be redeemed at $120.00 | 31,729,590.00 | |
| | | 58,170,915.00 |

| | | |
|---|---:|---:|
| Balance for 4% bonds | | $169,130,729.20 |
| Less 5% bonds to be exchanged for Am. Tob. Co. 4% bonds | $25,677,050.00 | |
| ½ Am. Tob. Co. 4% bonds to be redeemed at $96 | 24,649,968.00 | |
| | | 50,327,018.00 |

| | |
|---|---:|
| Balance after retirement of all bonds | $118,803,711.20 |

Against which there will be outstanding $52,459,400 of 6% preferred stock and $40,242,400 of common stock.

| | |
|---|---:|
| Value of sales | $ 65,622,948.26 |
| Earnings from manufacture and sale of tobacco, based on year 1910, 11.55% of entire amount invested, including trade-marks, brands, and assets | $ 11,369,809.82 |
| Earnings from investment securities based on year 1910 | 3,160,753.89 |
| | $ 14,530,563.71 |

### R. J. Reynolds Tobacco Company.

| | |
|---|---:|
| Assets | $10,516,247.59 |
| Trade-marks and brands | 1,146,923.00 |
| Total | $11,663,170.59 |
| Value of sales | 13,905,529.00 |
| Earnings based on 1910 | 1,675,616.00 |

### Liggett & Myers and P. Lorillard Company.

| | Liggett & Myers. | P. Lorillard Co. | Total. |
|---|---:|---:|---:|
| Assets | $30,607,261.96 | $28,091,748.86 | $ 58,699,010.82 |
| Trade-marks and brands | 36,840,237.04 | 19,460,752.14 | 56,300,989.18 |
| Total | $67,447,499.00 | $47,552,501.00 | $115,000,000.00 |
| Value of sales | $54,402,812.47 | $38,718,052.25 | $ 93,120,864.72 |
| Earnings based on 1910 | 7,468,172.02 | 5,264,729.38 | 12,732,901.40 |
| Earnings based on 1910, 11.02% of entire amount invested, including trade-marks, brands, and assets | $ 7,468,172.02 | $ 5,264,729.38 | $ 12,732,901.40 |
| Amount necessary to pay interest on 7% bonds | 1,085,548.59 | 765,344.16 | 1,850,892.75 |
| Earnings over and above amount necessary to pay interest on 7% bonds, available first to pay interest on 5% bonds | $ 6,382,623.43 | $ 4,499,385.22 | $ 10,882,008.65 |
| Amount necessary to pay interest on 5% bonds | 752,979.45 | 530,873.05 | 1,283,852.50 |
| Earnings over and above amount necessary to pay interest on 7% and 5% bonds, available first to pay interest on preferred stock | $ 5,629,643.98 | $ 3,968,512.17 | $ 9,598,156.15 |
| Amount necessary to pay dividends on preferred stock | 1,076,860.33 | 759,218.67 | 1,836,079.00 |
| Earnings over and above amount necessary to pay interest on all bonds and dividends on preferred stock, available as dividends on common stock | $ 4,552,783.65 | $ 3,209,293.50 | $ 7,762,077.15 |

## Exhibit D.

**Distribution of Factories and Principal Brands to the American Tobacco Company, Liggett & Myers Tobacco Company, and P. Lorillard Company.**

The American Tobacco Company:

| | |
|---|---|
| Durham, N. C., | (Blackwell's Durham Tobacco Co.) |
| New York, | (Butler-Butler, Inc.) |

The American Tobacco Company—Continued

| | |
|---|---|
| Milwaukee, Wis., | (F. F. Adams Tobacco Co.) |
| Danville, Va., | Danville Branch—little cigars. |
| Baltimore, | Ellis A—little cigars. |
| New York, | Duke Branch. |
| Baltimore, | Felgner Branch. |
| Louisville, | Finzer Branch. |
| New York, | Kinney Branch. |
| Baltimore, | Marburg Branch. |
| Richmond, | Mayo Branch. |
| Nashville, | (Nashville Tobacco Works.) |
| Richmond, | (R. A. Patterson Tobacco Co.) |
| Brooklyn, | Penn Street Branch—cigarettes. |
| Reidsville, N. C., | (F. R. Penn Tobacco Co.) |
| Middletown, Ohio, | Sorg Branch. |
| Louisville, | National Branch. |

Liggett & Myers Tobacco Company:

| | |
|---|---|
| St. Louis, | Liggett & Myers. |
| Chicago, | (Spaulding & Merrick.) |
| Richmond, | Allen & Ginter Branch. |
| San Francisco, | (John Bollman Co.) |
| Chicago, | Chicago Branch. |
| St. Louis, | Catlin Branch. |
| Toledo, | (Pinkerton Tobacco Co.) |
| Louisville, | (Nall & Williams Tobacco Co.) |
| New Orleans, | W. R. Irby Branch. |
| Durham, | W. Duke Sons & Co. Branch. |
| Wilmington, Del., | Wilmington A—little cigars. |
| Philadelphia, | Philadelphia A—little cigars. |

P. Lorillard Company:

| | |
|---|---|
| Jersey City, | Lorillard Factory. |
| New York, | (S. Anargyros.) |
| Middletown, Ohio, | (Luhrman & Wilbern Tobacco Co.) |
| Philadelphia, | Philadelphia B—little cigars. |
| Wilmington, Del., | Wilmington B—little cigars. |
| Danville, Va., | Danville B—little cigars. |
| Brooklyn, | Penn St.—little cigars. |
| Baltimore, | Ellis Branch B—little cigars. |
| Jersey City, }<br>Richmond, } | (Federal Cigar Co.) |

The American Tobacco Company will have:

Smoking Tobacco Brands.

| | |
|---|---|
| Lucky Strike, | Bull Durham, |
| Tuxedo, | Five Brothers, |
| Peerless, | Old English. |

Plug Tobacco Brands.

| | |
|---|---|
| American Navy, | Ivy, |
| Square Deal, | Corker, |
| Spear Head, | Town Talk, |
| Piper Heidsieck, | Newsboy. |
| Standard Navy, | |

Cigarette Brands.

| | |
|---|---|
| Sweet Caporal, | Hassan, |
| Pall Mall, | Mecca. |

Little Cigar Brand.

Sweet Caporal.

Fine Cut Brand.

Virgin Leaf.

Liggett & Myers Tobacco Company will have:

### Smoking Tobacco Brands.

U. S. Marine,                          King Bee,
Sweet Tip Top,                         Red Man,
Duke's Mixture,                        Velvet.
Home Run,

### Plug Tobacco Brands.

Star,                                  Horse Shoe.
Drummond's Natural Leaf,

### Cigarette Brands.

American Beauty,                       Imperiales,
Fatima,                                Home Run,
Piedmont,                              King Bee.

### Little Cigar Brand.

Recruit.

### Fine Cut Brands.

Sweet Cuba,                            Sterling.

P. Lorillard Company will have:

### Smoking Tobacco Brands.

Union Leader,                          Honest,
Sensation,                             Polar Bear.
Just Suits,

### Plug Tobacco Brands.

Climax,                                Planet.

### Cigarette Brands.

Helmer,                                Turkish Trophies,
Murad,                                 Egyptian Deities.
Mogul,

### Little Cigar Brands.

Between the Acts.

### Fine Cut Brands.

Tiger,                                 Century.

### *Exhibit E.*

Distribution of Purchases of Different Types of Tobacco, with Estimated Average Aggregate Production of Each Type.

The American Tobacco Company:                                    Pounds.
Burley ..................................................     41,969,957
Virginia and North Carolina...............................     51,295,870
Seed Leaf.................................................      6,112,099
Turkish ..................................................      2,988,898
Dark Western..............................................     19,433,365

Liggett & Myers Tobacco Company:
Burley ..................................................     69,163,946
Virginia and North Carolina...............................     27,755,411
Seed Leaf.................................................      5,676,180
Turkish ..................................................        558,611
Dark Western.............................................      3,196,866

P. Lorillard Company:
Burley ..................................................     24,074,643
Virginia and North Carolina...............................      2,556,007
Seed Leaf.................................................     19,993,726
Turkish ..................................................      3,974,386
Dark Western.............................................      1,446,213

| R. J. Reynolds Tobacco Company: | Pounds. |
|---|---|
| Burley | 5,000,000 |
| Virginia and North Carolina | 25,000,000 |
| Seed Leaf | |
| Turkish | |
| Dark Western | |

| British-American Tobacco Company, Limited: | |
|---|---|
| Virginia and North Carolina | 40,000,000 |
| Other types | 10,000,000 |

| Estimate of total average crop: | |
|---|---|
| Burley | 200,000,000 |
| Virginia and North Carolina | 240,000,000 |
| Dark Western | 200,000,000 |
| Seed | 180,000,000 |
| Turkish | 90,000,000 |

### *Exhibit F.*

Relative Ownership of Voting Stock Held by the Twenty-Nine Individual Defendants in the Aggregate (Both from What They Now Own, and from What They Will Receive by the Carrying Out of This Plan), and the Public.

The American Tobacco Company:
　Voting stock will be,
　　Preferred shares.................................................... 524,594
　　Common　　"　.................................................... 402,424
　　　　　　　　　　　　　　　　　　　　　　　　　　　　927,018

　Defendants will own,
　　Preferred shares.................................................... 98,640
　　Common　　"　.................................................... 227,278
　　　　　　　　　　　　　　　　　　　　　　　　　　　　325,918

　Balance held by others.................................................... Shares,　601,100
　　% of voting stock owned by defendants.................................. 35.16%
　　%　"　"　"　"　"　others..................................... 64.84%

Liggett & Myers Company:
　Voting stock will be,
　　Preferred shares.................................................... 153,837
　　Common　　"　.................................................... 214,963
　　　　　　　　　　　　　　　　　　　　　　　　　　　　368,800

　Defendants will own,
　　Preferred shares.................................................... 28,926
　　Common　　"　.................................................... 121,405
　　　　　　　　　　　　　　　　　　　　　　　　　　　　150,331

　Balance held by others.................................................... Shares,　218,469
　　% of voting stock owned by defendants.................................. 40.76%
　　%　"　"　"　"　"　others..................................... 59.24%

P. Lorillard Company:
　Voting stock will be,
　　Preferred shares.................................................... 108,460
　　Common　　"　.................................................... 151,556
　　　　　　　　　　　　　　　　　　　　　　　　　　　　260,016

　Defendants will own,
　　Preferred shares.................................................... 20,393
　　Common　　"　.................................................... 85,594
　　　　　　　　　　　　　　　　　　　　　　　　　　　　105,987
　Balance held by others.................................................... Shares,　154,029
　　% of voting stock owned by defendants.................................. 40.76%
　　%　"　"　"　"　"　others..................................... 59.24%

American Snuff Company:
　Voting stock will be,
　　Preferred shares.................................................... 40,000
　　Common　　"　.................................................... 110,017
　　　　　　　　　　　　　　　　　　　　　　　　　　　　150,017

　Defendants will own,
　　Preferred shares.................................................... 7,207
　　Common　　"　.................................................... 50,779
　　　　　　　　　　　　　　　　　　　　　　　　　　　　57,986

　Balance held by others.................................................... Shares,　92,031
　　% of voting stock owned by defendants.................................. 38.65%
　　%　"　"　"　"　"　others..................................... 61.35%

Geo. W. Helme Company:
 Voting stock will be,
  Preferred shares......................................... 40,000
  Common  " ......................................... 40,000
                   80,000

 Defendants will own,
  Preferred shares......................................... 7,207
  Common  " ......................................... 15,586
                   22,793

                   57,207
 Balance held by others.......................................
  % of voting stock owned by defendants................. 28.49%
  % " " " " " others................. 71.51%

Weyman & Bruton Company:
 Voting stock will be,
  Preferred shares......................................... 40,000
  Common  " ......................................... 40,000
                   80,000

 Defendants will own,
  Preferred shares......................................... 7,207
  Common  " ......................................... 15,586
                   22,793

                   57,207
 Balance held by others.......................................
  % of voting stock owned by defendants................. 28.49%
  % " " " " " others................. 71.51%

Conley Foil Company:
 Voting stock will be,
  Common shares......................................... 8,250
 Defendants will own......................................... Shares, 2,795

 Balance held by others................................. Shares, 5,455
  % of voting stock owned by defendants................. 33.88%
  % " " " " " others................. 66.12%

Johnston Tin Foil & Metal Company:
 Voting stock will be,
  Common ......................................... 3,000
 Defendants will own......................................... 1,012

 Balance held by others......................................... 1,988
  % of voting stock owned by defendants................. 33.73%
  % " " " " " others................. 66.27%

MacAndrews & Forbes:
 Voting stock will be,
  Common shares......................................... 30,000
 Defendants will own......................................... Shares, 11,930

 Balance held by others................................. Shares, 18,070
  % of voting stock owned by defendants................. 39.77%
  % " " " " " others................. 60.23%

J. S. Young Company:
 Voting stock will be,
  Common ......................................... 10,000
 Defendants will own......................................... 4,387

 Balance held by others......................................... 5,613
  % of voting stock owned by defendants................. 43.87%
  % " " " " " others................. 56.13%

R. J. Reynolds Tobacco Company:
 Voting stock will be,
  Common shares......................................... 75,250
 Defendants will own......................................... Shares, 28,238

 Balance held by others................................. Shares, 47,012
  % of voting stock owned by defendants................. 37.53%
  % " " " " " others................. 62.47%

United Cigar Stores Company:
 Voting stock will be,
  Common shares......................................... 90,010
 Defendants will own......................................... Shares, 33,886

 Balance held by others................................. Shares, 56,124
  % of voting stock owned by defendants................. 37.65%
  % " " " " " others................. 62.35%

British-American Tobacco Company:
Voting stock will be,

| | |
|---|---|
| Ordinary shares | 3,720,021 |
| Defendants will own | 1,282,021 |

| | | |
|---|---|---|
| Balance held by others | | 2,438,000 |
| % of voting stock owned by defendants | 34.46% | |
| % " " " " others | 65.54% | |

Porto Rican-American Tobacco Company:
Voting stock will be,

| | | |
|---|---|---|
| Common shares | | 19,994 |
| Defendants will own | Shares, | 9,059 |

| | | |
|---|---|---|
| Balance held by others | Shares, | 10,935 |
| % of voting stock owned by defendants | 45.31% | |
| % " " " " others | 54.69% | |

## DECREE.

Appeals having been taken by the plaintiff and certain defendants in this cause from the decree entered by this court on the 15th day of December, 1908, the Supreme Court of the United States reversed said decree and issued its mandate, filed herein on the 30th day of June, 1911, by which the said cause was remanded to this court, with directions to enter a decree in conformity with the opinion of the Supreme Court of the United States, and to take such further steps as might be necessary to fully carry out said directions. By the said opinion of the Supreme Court of the United States this court was directed to "hear the parties by evidence or otherwise, as it may deem proper, for the purpose of ascertaining and determining upon some plan or method of dissolving the combination, and of recreating out of the elements now composing it a new condition which shall be honestly in harmony with, and not repugnant to, the law, but without unnecessary injury to the public or the rights of private property." And this cause having come on to be finally heard pursuant to the order or decree of this court, made and entered herein on August 3, 1911, on the mandate of the Supreme Court of the United States as aforesaid, the American Tobacco Company and the other defendants herein—except United Cigar Stores Company, the Imperial Tobacco Company (of Great Britain and Ireland), Limited, and R. P. Richardson, Jr., & Co., Incorporated—filed in this court, on October 16, 1911, a petition proposing and embodying a plan or method of dissolving the combination, and of recreating out of the elements now composing it a new condition in harmony with, and not repugnant to, the law. Due notice was given to the parties hereto that the hearing on the said petition would be had on October 30, 1911, in room 124 of the Federal Building, in New York City; and thereafter, to wit, on the 19th day of October, 1911, the Imperial Tobacco Company (of Great Britain and Ireland), Limited, filed a petition.

At the time and place aforesaid, the plaintiff filed answers to the said petitions, embodying proposed modifications of, and additions to, the plan proposed in said petition of the American Tobacco Company and other defendants. The parties having been heard by counsel, and certain of the modifications of said plan included in the answer of the plaintiff not being opposed by the proponents of said plan, and others of said modifications included in said answer having been disposed of by this court in its opinions delivered after said hearing:

Now, it is ordered, adjudged, and decreed that all the defendants—except Welford C. Reed, who died before the final hearing—heretofore became parties to and engaged in the combination assailed in the pleadings, which "in and of itself, as well as each and all of the elements composing it, whether corporate or individual, whether considered collectively or separately," is "in restraint of trade and an attempt to monopolize and a monopolization within the first and second sections of the anti-trust act," and which should be dissolved and a new condition brought about in harmony with, and not repugnant to, the law, either as a consequence of the action of this court in determining an issue or in accepting a plan agreed upon.

And it is further ordered, adjudged, and decreed, that said plan as modified by the consent of the parties, or through the action of this court as aforesaid, is as follows, to wit:

191 F.—27

### A. Dissolution of Amsterdam Supply Company.

Amsterdam Supply Company is a company engaged in the business of purchasing, for a commission or brokerage, supplies, other than leaf tobacco; its principal customers being defendant corporations herein. It has $235,000 at par of stock, all held in varying amounts by certain corporation defendants, one or the other of your petitioners, and a surplus of $127,058.74.

It is proposed that Amsterdam Supply Company be dissolved, converting its assets into cash and distributing them to its stockholders.

### B. Abrogation of Foreign Restrictive Covenants.

Under the contracts of September 27, 1902, the Imperial Tobacco Company (of Great Britain and Ireland), Limited, and certain of its directors agreed not to engage in the business of manufacturing or selling tobacco in the United States, the American Tobacco Company and American Cigar Company and certain of their directors agreed not to engage in the business of manufacturing or selling tobacco in Great Britain and Ireland, and the American Tobacco Company, American Cigar Company, and the Imperial Tobacco Company agreed not to engage in the business of manufacturing or selling tobacco in countries other than Great Britain and Ireland and the United States. Under the provisions of these contracts British-American Tobacco Company, Limited, was organized and took over the export businesses of the American Tobacco Company and the Imperial Tobacco Company, with factories, materials, and supplies.

It is proposed that the covenants herein just described, as well as all covenants restricting the right of any company or individual in the combination to buy, manufacture, or sell tobacco or its products, be rescinded by the affirmative action of the respective parties thereto who are parties to this suit, except such of said covenants, whether or not contained in the contracts of September 27, 1902, as (a) relate wholly to business in foreign countries, and are covenants the benefit whereof has been assigned or transferred to other parties, or (b) are covenants exclusively between foreign corporations and relating wholly to business in or between foreign countries, and that the said contracts of September 27, 1902, be altogether terminated so far as they impose any obligations upon any of the parties thereto to furnish or to refrain from furnishing manufactured tobaccos to any party, each company to treat as its own, but only to the extent provided for in said contracts, all brands and trade-marks which by said contracts it was given the right to manufacture and sell, the said rights having been perpetual and constituting in effect a conveyance of the brands and trade-marks used for the countries in which they were so used by each of said companies as aforesaid.

### C. Abrogation of Domestic Restrictive Covenants.

It is proposed that covenants given by vendor corporations, partnerships, or individuals, or by stockholders of vendor corporations, to vendee corporations defendants herein, not to engage in the tobacco business or any other business in any way embraced in the combination, be terminated, so that all such covenantors shall be at liberty to engage in the business of buying, manufacturing, and dealing in tobacco and its products just as if such covenants had not been made.

### D. Disintegration of Accessory Companies.

#### (1) The Conley Foil Company.

The Conley Foil Company has a capital stock of $825,000 at par, all of one class, of which the American Tobacco Company owns $495,000 at par; the balance being held by persons not defendants nor connected with defendants. It is engaged in the business of manufacturing tin foil, a product used largely by tobacco manufacturers, but having other uses as well. The Conley Foil Company has a plant in New York City, and it owns all the stock and bonds of the Johnston Tin Foil & Metal Company, which has a plant in St. Louis. The value of the output for the year 1910 of the Conley Foil Company was $1,780,526.85, with a net profit of $273,299.82, and the

Johnston Tin Foil & Metal Company had an output for the year 1910 of the value of $676,520.05, and net profits of $66,255.16. On December 31, 1910, the Conley Foil Company had tangible assets (excluding its securities of the Johnston Tin Foil & Metal Company) of $1,215,321, and the Johnston Tin Foil & Metal Company had assets of the value of $379,802.11. The Conley Foil Company has a surplus exceeding the value of the securities of the Johnston Tin Foil & Metal Company.

It is proposed that the Conley Foil Company cancel the bonds of the Johnston Tin Foil & Metal Company held by it, to wit, $100,000 par value, and distribute to its stockholders its holdings of stock of the Johnston Tin Foil & Metal Company, to wit, 3,000 shares, all of one class. The American Tobacco Company, being a stockholder of the Conley Foil Company, will participate in this distribution, and will in turn distribute its dividend, as well as its stock in the Conley Foil Company, to its common stockholders as hereinafter set forth.

### (2) MacAndrews & Forbes Company.

MacAndrews & Forbes Company is a company having a common capital stock of $3,000,000 at par, of which the American Tobacco Company owns $2,112,900 at par, the balance being held by persons not defendants nor connected with defendants (except less than 3⅓ per cent. of the common stock held by R. J. Reynolds Tobacco Company), and $3,758,300 at par of 6 per cent. nonvoting preferred stock, of which the American Tobacco Company holds $750,000 at par; the balance being held by persons not defendants nor connected with defendants. It is engaged in the production of licorice paste, with two plants, one at Camden, N. J., and the other at Baltimore, Md. It had tangible assets, December 31, 1910, of the value of $5,683,824.89 (including $2,118,448.36, licorice root, with plants for its collection in foreign countries), and its sales for the year 1910 were of the value of $4,427,023.44. MacAndrews & Forbes Company succeeded to the business MacAndrews & Forbes, a partnership, who were pioneers in this country in the production of licorice paste, and who had for many years before any acquisitions of other business, and before they had any connection with the other defendants herein, more than 50 per cent. of all the licorice paste business of the United States.

It is proposed that a new corporation be organized, called the J. S. Young Company, and that it shall acquire the Baltimore plant of MacAndrews & Forbes Company, with the assets used therein and in connection therewith, of a total value of $1,000,000, and the brands of licorice paste manufactured in said Baltimore plant; that it issue in payment therefor, with the good will connected therewith, $1,000,000 at par of 7 per cent. preferred nonvoting stock, and $1,000,000 at par of common stock; that MacAndrews & Forbes Company distribute the common stock of the J. S. Young Company as a dividend to its common stockholders, charging the amount thereof to its surplus account; that MacAndrews & Forbes Company offer to its preferred stockholders proportionately to exchange the 7 per cent. preferred stock of the J. S. Young Company at par for their preferred stock of MacAndrews & Forbes Company; that, so far as the preferred stock of MacAndrews & Forbes Company is thus exchanged, it be retired; that, so far as this preferred stock of the J. S. Young Company is not forthwith thus exchanged, MacAndrews & Forbes Company be enjoined from using it to exercise, or otherwise exercising or attempting to exercise, influence or control over the J. S. Young Company; and with the further provision that on or before January 1, 1915, the whole of this preferred stock of the J. S. Young Company, not theretofore taken out of the treasury of MacAndrews & Forbes Company by exchange as aforesaid, be disposed of by MacAndrews & Forbes Company.

This would give to MacAndrews & Forbes Company a licorice business, including Spanish licorice and powdered goods, of the net selling value, based upon the year 1910, of $2,514,184.64, of which $2,214,127.51 arise from sales of one brand, to wit, the old "Ship" brand. The J. S. Young Company, upon the basis of the business for the year 1910, would have an output of the net selling value of $1,201,109.86.

The American Tobacco Company, being a holder of the common stock of MacAndrews & Forbes Company, will participate in the distribution above provided, and will in turn distribute its dividend, as well as its stock in MacAndrews & Forbes Company, to its common stockholders as hereinafter set forth.

### (3) American Snuff Company.

American Snuff Company is a manufacturer of snuff. It holds all of the stock of De Voe Snuff Company, to wit, $50,000 at par, and one-half, to wit, $26,000 at par, of the stock of National Snuff Company. It owns no other interest in any company manufacturing or selling snuff.

It is proposed that there be organized two new snuff companies, one to be called the George W. Helme Company and the other Weyman & Bruton Company, and that American Snuff Company convey to these two companies respectively factories, with the brands manufactured in them, as follows: To the George W. Helme Company the factories at Helmetta, N. J., and Yorklyn, Del., except factory No. 5; to Weyman & Bruton Company the factories at Chicago and Nashville, also all the stock of De Voe Snuff Company, and the one-half of the stock of National Snuff Company held by American Snuff Company. Based upon the business for the year 1910 and the assets at the end of the year, with proper provision for leaf, materials, cash, and book accounts for the two vendee companies, this would leave the three companies equipped as follows:

Manufacturing Tangible Assets.

American Snuff Company..................................... $5,075,969.72 [b]
George W. Helme Company................................ 4,909,000.40
Weyman & Bruton Company.............................. 3,691,588.20

Sales Value During 1910.

American Snuff Company..................................... $5,520,422.15
George W. Helme Company................................ 4,494,556.66
Weyman & Bruton Company.............................. 4,297,486.71

Net Income.

American Snuff Company..................................... $1,591,280.49 [b]
George W. Helme Company................................ 1,259,280.98
Weyman & Bruton Company.............................. 1,293,759.39

Each of these vendee corporations will pay for the property and business conveyed to it by the issue of $4,000,000 at par of 7 per cent. voting preferred stock, and $4,000,000 at par of common stock. American Snuff Company will thus receive the $16,000,000 at par of these stocks into its treasury and will distribute to its common stockholders, as a dividend, the common stock aggregating $8,000,000, to be charged to its surplus account. American Snuff Company will offer to its preferred stockholders proportionately to exchange these 7 per cent. preferred stocks of the George W. Helme Company and the Weyman & Bruton Company for their preferred stock of American Snuff Company at par. So much of the preferred stock of American Snuff Company as is thus exchanged will be retired. As to so much of the preferred stocks of the George W. Helme Company and the Weyman & Bruton Company as is not forthwith thus exchanged, American Snuff Company to be enjoined from voting it, or using it to exercise, or otherwise exercising, or attempting to exercise, influence or control over the George W. Helme Company or the Weyman & Bruton Company; and on or before January 1, 1915, all of these preferred stocks of the George W. Helme Company and the

---

[b] American Snuff Company holds securities not connected with the snuff business, to wit, stock and bonds of the American Tobacco Company, and preferred stock of American Cigar Company, aggregating in book value $2,530,216.69, upon which American Snuff Company received in interest and dividends during the year 1910 $176,680. It is proposed that American Snuff Company sell or otherwise dispose of these securities within three years, and that in the meantime they be held under an injunction as is provided in this paragraph with respect to securities of the George W. Helme Company and Weyman & Bruton Company to be temporarily held by it. It also owns all, to wit, $100,000 at par, of the stock of Garrett Real Estate Company, which will be dissolved and liquidated.

Weyman & Bruton Company, not theretofore taken out of the treasury of American Snuff Company by exchange as aforesaid, to be disposed of by American Snuff Company.

The American Tobacco Company, being a holder of the common stock of American Snuff Company, will participate in the distribution above provided, and will, in turn, distribute its dividend, as well as its stock in American Snuff Company, including that to be acquired from P. Lorillard Company, to its common stockholders as hereinafter set forth.

#### (4) American Stogie Company.

American Stogie Company is a corporation whose only asset is all of the issued stock of Union-American Cigar Company, which latter company has cigar factories located at Pittsburgh, Allegheny, Lancaster, and Newark. Its total production, based upon business for the year 1910, is only 1.58 per cent. of the entire production of cigars in the United States in volume, and, as these petitioners believe, about the same percentage in value. American Stogie Company has $976,000 at par of 7 per cent. cumulative preferred stock, of which American Cigar Company owns $40,000 at par, and none of the other defendants own any. It has $10,879,000 at par of common stock, of which American Cigar Company owns $7,303,775 at par, and none of the other defendants own any. There are accumulated and unpaid dividends on the preferred stock to the amount of $399,000 as of December 31, 1910.

It is proposed that American Stogie Company dissolve, with leave granted to the trustees in dissolution to either convert the assets into cash, and distribute them among the stockholders according to their rights, or to effect such reorganization as they may be able to effect; provided, that in either event there shall be a separation into at least two different ownerships of the factories and businesses now owned and operated by Union-American Cigar Company. If the dissolution is followed by a conversion of the assets of American Stogie Company into cash, American Cigar Company will take such cash as it may receive into its treasury; if it receives upon such dissolution securities of cigar manufacturing concerns, it will distribute such as a dividend to its common stockholders, to be charged to its surplus as hereinafter set forth.

#### (5) American Cigar Company.

American Cigar Company is a manufacturer of cigars. It has various factories of its own, and it owns all or a part of the stock of several companies engaged in the manufacture of cigars, all of which companies have been organized by it and which have received from it conveyances of part of its business, operating in this way as separate corporations for trade purposes. Among these companies is Federal Cigar Company.

American Cigar Company also owns a part of the stock of Havana Tobacco Company, which controls factories manufacturing cigars in Havana, and a part of the stock of Porto Rican-American Tobacco Company, engaged in the manufacture of cigars and cigarettes in Porto Rico, and half of the stock of Porto Rican Leaf Tobacco Company, engaged in growing tobacco in Porto Rico. American Cigar Company itself uses large quantities of Porto Rican grown leaf. Neither American Cigar Company nor any of the companies in which it is interested, except Havana Tobacco Company and Porto Rican-American Tobacco Company, is engaged in the manufacture of cigars outside of the United States.

American Cigar Company, including with its production the production of companies of which it owns in whole or in part the stock, has, in volume, based on the business for the year 1910, 13.36 per cent. of the cigar business of the United States, and in value, as your petitioners believe, substantially the same percentage. Havana Tobacco Company has, directly or indirectly, control of 24.06 per cent. of the total production of cigars in Cuba, 46.00 per cent. of the total exportation of cigars from Cuba to all countries of the world, including the United States, and 38.15 per cent. of the total exportation of cigars from Cuba to the United States.

It is proposed that American Cigar Company dispose of properties belonging to it, and thus disintegrate its business, as follows:

(a) That it sell to the American Tobacco Company, for cash, its stock, being all thereof, of Federal Cigar Company, at a fair price, to wit, $3,965,-616.05.

(b) That it sell to the American Tobacco Company, for cash. the stock it owns of Porto Rican-American Tobacco Company, to wit, $657,600 at par, at a fair price, to wit, $350 per share, or $2.301,600.

(c) That American Cigar Company dispose of any interest in American Stogie Company by receiving cash proceeds of its stock in dissolution thereof, if American Stogie Company upon dissolution converts its assets into cash, or by distributing as a dividend to its common stockholders out of its surplus the securities which it receives upon the dissolution of American Stogie Company, if it receives such.

All stocks thus to be acquired by the American Tobacco Company from American Cigar Company are to be disposed of by the American Tobacco Company as hereinafter set out.

### E. Distribution by the American Tobacco Company of Stocks Owned or to be Acquired by It.

#### (1) Immediate Distribution of Stocks.

The American Tobacco Company will buy from P. Lorillard Company, for cash at par, the 11,247 shares of the preferred stock of American Snuff Company held by P. Lorillard Company, and will receive, as the sole common stockholder of P. Lorillard Company, and by way of dividends, 34,594 shares of the common stock of American Snuff Company held by P. Lorillard Company.

The American Tobacco Company will distribute among its common stockholders by way of dividends, and to be charged to its surplus, all of its securities of the following described classes, whether now owned by it or bought by it from American Cigar Company, as hereinbefore set forth, or bought by it from P. Lorillard Company, as just hereinbefore set forth, or received by it by way of dividends from any of the accessory companies defendant, as hereinbefore set forth, to wit:

American Snuff Company common stock.
American Snuff Company preferred stock.
George W. Helme Company common stock.
Weyman & Bruton Company common stock.
MacAndrews & Forbes Company common stock.
J. S. Young Company common stock.
The Conley Foil Company stock.
The Johnston Tin Foil & Metal Company stock.
R. J. Reynolds Tobacco Company stock.
Corporation of United Cigar Stores stock.
British-American Tobacco Company, Limited, ordinary shares.
Porto Rican-American Tobacco Company stock.
American Stogie Company stock (or what is received by way of dividends from American Cigar Company upon dissolution of American Stogie Company).

Including the amount to be paid to American Cigar Company and P. Lorillard Company for such of these securities as are to be acquired by the American Tobacco Company from them respectively. and excluding those to be acquired by way of dividends, and which, therefore, do not affect the surplus of the American Tobacco Company, never having been set up on its books, these securities had a book value as of December 31. 1910, of $35,011,-865.03. The earning capacity of all the above securities thus to be distributed, based upon the results of the year 1910, is $9,860,410.76, though not all thereof was distributed as dividends.

#### (2) Deferred Disposition of Stocks.

The American Tobacco Company will sell or otherwise dispose of, or distribute by way of dividends to its common stockholders out of its surplus at the time existing, before January 1, 1915, all of its holdings of the following securities:

British-American Tobacco Company, Limited, nonvoting preference shares.

The Imperial Tobacco Company (of Great Britain and Ireland), Limited, ordinary shares.

Corporation of United Cigar Stores bonds.

MacAndrews & Forbes Company nonvoting preferred stock.

During the time these securities are left in the treasury of the American Tobacco Company, the American Tobacco Company to be enjoined from voting any thereof that under the terms thereof might be voted, or using any thereof to exercise, or otherwise exercising or attempting to exercise, influence or control over the said companies which issued the said securities respectively, and from gaining possession of any of the said companies by buying in at a foreclosure had under any of the securities, for any default with respect thereto or otherwise.

### F. Sale by the American Tobacco Company of Manufacturing Assets and Business to Companies to be Formed.

(1)

There will be organized a new corporation called Liggett & Myers Tobacco Company, and a new corporation called P. Lorillard Company, and the American Tobacco Company will sell, assign, and convey to these two companies factories, plants, brands, and businesses, and capital stocks of tobacco manufacturing corporations, as follows:

To Liggett & Myers Tobacco Company:

Liggett & Myers branch of the American Tobacco Company, engaged in the manufacture of plug tobacco at St. Louis, with the brands connected therewith.

Spaulding & Merrick, a company of which the American Tobacco Company owns, and has always owned, all the stock, engaged in Chicago in the manufacture of fine cut tobacco and smoking tobacco.

Allen & Ginter branch of the American Tobacco Company, engaged in the manufacture of cigarettes at Richmond, Va., and the brands connected therewith (this does not include the brand "Sweet Caporal," made partly there and partly at New York).

Chicago branch of the American Tobacco Company, a factory at Chicago engaged in the manufacture of smoking tobacco, with the brands connected therewith.

Catlin branch of the American Tobacco Company, a factory at St. Louis engaged in the manufacture of smoking tobacco, with the brands connected therewith.

Nall & Williams Tobacco Company, a company of which the American Tobacco Company owns all the stock, engaged in the manufacture of plug and smoking tobacco at Louisville, Ky.

The John Bollman Company, a company engaged in the manufacture of cigarettes at San Francisco. Of this corporation the American Tobacco Company owns 90 per cent. of the stock, which it is proposed to turn over to the Liggett & Myers Tobacco Company.

Pinkerton Tobacco Company, a corporation engaged in the manufacture of scrap tobacco (a kind of smoking tobacco) at Toledo, Ohio. Of this corporation the American Tobacco Company owns 77½ per cent. of the stock, which it is proposed to turn over to the Liggett & Myers Tobacco Company.

W. R. Irby branch of the American Tobacco Company at New Orleans, engaged in the manufacture of cigarettes and smoking tobacco; the principal brands being "Home Run" and "King Bee."

The Duke-Durham branch of the American Tobacco Company, engaged in the manufacture of cigarettes and smoking tobacco at Durham, N. C.; principal cigarette brands, "Piedmont" and "American Beauty"; principal smoking tobacco brand, "Duke's Mixture."

Two little cigar factories located, the one at Philadelphia, and the other at Baltimore, branches of the American Tobacco Company; principal brand, "Recruits."

To P. Lorillard Company:

All the rights of the American Tobacco Company in the present P. Lorillard Company, to wit, all the common stock and $1,596,100 at par out of a total issue of $2,000,000 of 8 per cent. preferred stock. It is contemplated that as a part of these reorganizations the Lorillard Company, as at present constituted, be wound up and the new company be organized, taking over assets of the P. Lorillard Company.

S. Anargyros, a company engaged in the manufacture of cigarettes, in which the American Tobacco Company owns all the stock, and of which it has always owned all the stock.

Luhrman & Wilbern Tobacco Company, a company engaged in the manufacture of scrap tobacco (a kind of smoking tobacco), of which the American Tobacco Company owns, and has for many years owned, all the stock.

Philadelphia branch B at Philadelphia, Wilmington branch B at Wilmington, Penn Street branch at Brooklyn, Danville branch B at Danville, and Ellis branch B at Baltimore, branches of the American Tobacco Company manufacturing little cigars; the principal brand being "Between the Acts."

Federal Cigar Company, a company all of whose stock is, and has always been, owned by American Cigar Company, but which, as hereinbefore provided, is to be purchased for cash by the American Tobacco Company.

Each of these conveyances to include proper and adequate storage houses, leaf tobacco, and other materials and supplies, provision for book accounts, including in each case a ratable proportion of the cash held by the American Tobacco Company on December 31, 1910, so that each of the new corporations will be fully equipped for the conduct of the business of manufacturing and dealing in tobacco.

(2) Resources and Capitalization of Companies and Provisions for Exchanging and Retiring Securities of American Tobacco Company.

The American Tobacco Company has securities issued and outstanding as follows:

| | |
|---|---|
| 6% bonds................................................... | $52,882,650 |
| 4% bonds (including outstanding 4% bonds of Consolidated Tobacco Company)............................................ | 51,354,100 |
| 6% preferred stock......................................... | 78,689,100 |
| Common stock.............................................. | 40,242,400 |

The American Tobacco Company in October, 1904, immediately after the merger, had an outstanding issue of its own 4 per cent. bonds and the Consolidated Tobacco Company 4 per cent. bonds which it assumed, amounting to $78,689,100, but it has purchased on the market and retired $27,335,000 at par of these 4 per cent. bonds, charging the amount thus expended to surplus. The 6 per cent. bonds and 4 per cent. bonds aforesaid are what are ordinarily known as "debenture bonds," and are issued under a trust indenture which imposes a general charge on the property, income, and earnings of the company in favor, first, of the 6 per cent. bonds, and, second, of the 4 per cent. bonds. The American Tobacco Company, after the reduction of the surplus through the acquisition by it of 4 per cent. bonds as aforesaid, had on December 31, 1910, a surplus of $61,119,991.63, which will be increased by the surplus earnings of the current year. The distribution of securities herein provided for to be forthwith made would diminish the said surplus by $35,011,865.03, the book value of securities to be so distributed. This book value is less than actual value; but, in view of the fact that none of the assets of the American Tobacco Company are overvalued, the advance of the book value of the securities to be distributed as hereinbefore set forth to their actual value would operate at the same time to increase the surplus of the company, and so its surplus, after such distribution, would remain just the same as though the advance to actual value had not been made on the books of the company.

The properties to be conveyed to the Liggett & Myers Tobacco Company and P. Lorillard Company, based upon conditions as of December 31, 1910, the last completed year, including in such conveyances the proper and proportionate storage houses, leaf tobacco, supplies and materials, and cash,

but without anything for value of brands, trade-marks, formulæ, recipes, and good will, but including stocks of companies, are of the value of, $30,607,261.96 to Liggett & Myers Tobacco Company and $28,091,748.86 to P. Lorillard Company. So far as these conditions shall be changed before the day of the conveyance, any deficiency is to be made good in cash, so that these two companies will have said amounts in tangible assets, as aforesaid, useful, and such as have been used, in the manufacture of the brands to be conveyed to them respectively, and cash. The American Tobacco Company will be left with tangible assets, including stocks of companies employed in manufacturing tobacco and its products, cash, and bills and accounts receivable, of the value of $53,408,498.94 as of December 31, 1910. The profits earned during the year 1910 on the brands and businesses to be conveyed by the American Tobacco Company to Liggett & Myers Tobacco Company amounted to $7,468,172.02, and the profits on the brands and businesses to be conveyed by the American Tobacco Company to P. Lorillard Company amounted to $5,264,729.38.

It is proposed that the value of the brands, trade-marks, recipes, formulæ, and good will to be sold to each of these companies be determined by their earning capacity, based upon the results for the year 1910, so that each shall have an earning capacity of 11.02 per cent. per annum upon its total property, including both tangible property and brand value and good will. Upon this basis the consideration to be paid by the Liggett & Myers Tobacco Company will be $30,607,261.96, value of tangible assets as above stated, and $36,840,237.04, value of brands, trade-marks, recipes, formulæ, and good will, making a total of $67,447,499; and the consideration to be paid by the P. Lorillard Company will be $28,091,748.86, value of tangible assets as above stated, and $19,460,752.14, value of brands, trade-marks, recipes, formulæ, and good will, making a total of $47,552,501. The brands, trade-marks, recipes, formulæ, and good will of the American Tobacco Company, on December 31, 1910, were of the book value of $101,324,964.07. The payments for brand value, etc., to the American Tobacco Company to be made by Liggett & Myers Tobacco Company and P. Lorillard Company as aforesaid, makes an aggregate of $56,300,989.18, and would thus leave the book value of brands, trade-marks, recipes, formulæ, and good will retained by the American Tobacco Company at $45,023,974.89, which, added to the $53,408,498.94 of tangible manufacturing assets to be retained by the American Tobacco Company, will make the total book value of manufacturing property to be retained by that company $98,432,473.83, upon which its earnings, based upon the results for the year 1910, would be $11,369,809.82, or 11.55 per cent.

The Liggett & Myers Tobacco Company and the P. Lorillard Company would pay for these conveyances, therefore, the aggregate as aforesaid, to wit:

Liggett & Myers Tobacco Company............................ $ 67,447,499
P. Lorillard Company....................................... 47,552,501

Aggregating ........................................ $115,000,000

—or each with its earnings on the business for the year 1910 so capitalized that said earnings represent 11.02 per cent. upon the capital.

Liggett & Myers Tobacco Company and P. Lorillard Company will issue securities to cover such capitalization in the aggregate as follows: To an amount equal to one-half of the outstanding 6 per cent. bonds of the American Tobacco Company, that is, $26,441,325 at par in 7 per cent. bonds; to an amount equal to one-half of the outstanding 4 per cent. bonds of the American Tobacco Company, that is. $25,677,050 at par in 5 per cent. bonds; to an amount equal to one-third of the outstanding preferred stock of the American Tobacco Company, that is, $26,229,700 at par, in 7 per cent. cumulative voting preferred stock—which, upon liquidation of the company, shall be paid at par with accrued unpaid dividends, before any amount shall be paid to common stock, with balance of assets distributable ratably to the common stock, and the balance of said $115,000,000, that is, $36,651,925, in common stock, the 7 per cent. bonds and the 5 per cent. bonds to mature at the time fixed respectively for the maturity of the 6 per cent. bonds and the

4 per cent. bonds of the American Tobacco Company now outstanding, and to be issued under an indenture of substantially like tenor and terms with the present indenture of the American Tobacco Company under which its 6 per cent. bonds and 4 per cent. bonds were issued, the 7 per cent. bonds to have priority in charge over the 5 per cent. bonds in the same way that the 6 per cent. bonds of the American Tobacco Company have priority of charge over the 4 per cent. bonds. Thus the capitalization of the Liggett & Myers Tobacco. Company and P. Lorillard Company will be as follows:

|  | Liggett & Myers. | Lorillard. | Total. |
|---|---|---|---|
| 7% bonds | $15,507,837 | $10,933,488 | $ 26,441,325 |
| 5% bonds | 15,059,589 | 10,617,461 | 25,677,050 |
| 7% preferred stock | 15,383,719 | 10,845,981 | 26,229,700 |
| Common stock | 21,496,354 | 15,155,571 | 36,651,925 |
|  | $67,447,499 | $47,552,501 | $115,000,000 |

All of these securities of the Liggett & Myers Tobacco Company and the P. Lorillard Company to be turned over to the American Tobacco Company in payment of the purchase price for the factories, plants, brands, and businesses and capital stocks of tobacco manufacturing corporations so to be conveyed to Liggett & Myers Tobacco Company and P. Lorillard Company respectively as hereinbefore set out.

These securities will be disposed of by the American Tobacco Company as follows:

The common stock will be offered for cash at par to the holders of the common stock of the American Tobacco Company in proportion to their holdings, and any not purchased by the person thus entitled thereto shall be sold to persons other than the individual defendants, to the end that such offer of common stock of the two new companies to the common stockholders of the American Tobacco Company shall not be used by the individual defendants to increase their ownership therein beyond the proportion of their holdings of the common stock of the American Tobacco Company.

To each holder of the 6 per cent. bonds of the American Tobacco Company an offer shall be made to acquire his bonds for cancellation, and to give in exchange therefor, as to one half thereof, new 7 per cent. bonds of Liggett & Myers Tobacco Company and P. Lorillard Company at par, and, in payment for the other half thereof, cash at the rate of $120 and accrued interest for each $100 face value of the bonds.

To each holder of the 4 per cent. bonds of the American Tobacco Company an offer shall be made to acquire his bonds for cancellation, and to give in exchange therefor, as to one half thereof, new 5 per cent. bonds of Liggett & Myers Tobacco Company and P. Lorillard Company at par, and, in payment for the other half thereof, cash at the rate of $96 and accrued interest for each $100 face value of the bonds.

To each holder of the preferred stock of the American Tobacco Company an offer shall be made to acquire one-third of his stock for cancellation in exchange for an equal amount at par of Liggett & Myers Tobacco Company and P. Lorillard Company.

On account of the larger capitalization of the Liggett & Myers Tobacco Company as compared with the P. Lorillard Company, each class of the new securities will issue in the proportion of 58.65 per cent. thereof of Liggett & Myers Tobacco Company securities and 41.35 per cent. thereof of P. Lorillard Company securities. The stocks will be issued in shares of $100, and coupon bonds in denominations of $1,000, and registered bonds in larger denominations, and in denominations of $100 and $50, and in actual issue fractions will be eliminated.

The common stocks of the two companies aforesaid are to be sold as above set out prior to March 1, 1912, with three years to be allowed for the retirement of the bonds and preferred stock of the American Tobacco Company, as above set out. Pending such, the said 7 per cent. bonds, 5 per cent. bonds, and 7 per cent. preferred stocks of the Liggett & Myers Tobacco Company and the P. Lorillard Company, together with an amount in cash,

or in securities owned by the American Tobacco Company, at their book value. or partly in cash and partly in such securities, equal to the amounts required if all such sales and exchanges are made, will be deposited with the Guaranty Trust Company of New York, the trustee in the indenture under which the 6 per cent. bonds and the 4 per cent. bonds of the American Tobacco Company are issued, as the agency to effect the purchase and exchange. Such deposit will be made, not to secure nor create a trust fund for the bonds, but for the purpose of sequestrating and taking from the control of the American Tobacco Company the securities and cash so deposited. During the time of such deposit the securities shall be in the name of, as well as in the custody of, said Trust Company, with any voting rights attaching thereto, but the American Tobacco Company shall receive from the Trust Company all dividends and interest collected by it on account of such securities, and the American Tobacco Company shall have the right at any time and from time to time to sell, at such price as it may determine, and direct the delivery of any of such securities (except the securities of Liggett & Myers Tobacco Company and P. Lorillard Company), the consideration therefor to go into the hands of said Trust Company, or to withdraw any of such securities (except the securities of Liggett & Myers Tobacco Company and P. Lorillard Company) for the purpose of distribution among its common stockholders, if its surplus at the time permits, or to substitute other securities of like book value for the securities so deposited (except as to the securities of Liggett & Myers Tobacco Company and P. Lorillard Company), or to alter the relative proportion of cash and securities: it being the intent of this provision that there shall be sequestrated from the control of the American Tobacco Company all the securities of the Liggett & Myers Tobacco Company and P. Lorillard Company, and an additional amount of cash or other securities equal, upon the purchase basis aforesaid, to the value of the 4 per cent. bonds and the 6 per cent. bonds of the American Tobacco Company at the time outstanding. At the end of the three years, if there are any of such securities of the Liggett & Myers Tobacco Company or P. Lorillard Company in the hands of such trust company undisposed of by such exchange as aforesaid, then the American Tobacco Company shall apply to this court for an order as to the disposition thereof. Nothing contained in this provision, and nothing done under this provision, shall be construed as providing for the creation of, or as creating, any lien or security on anything deposited with the trust company in favor of the 6 per cent. bonds or the 4 per cent. bonds of the American Tobacco Company outstanding or otherwise.

### G. Voting Rights to Preferred Stock.

By proper amendment of the certificate of incorporation of the American Tobacco Company, the preferred stock will be given full voting rights.

### H. Certain Incidental Provisions.

#### (1)

P. Lorillard Company is a New Jersey company, with $3,000,000 of common stock, all of which is owned by the American Tobacco Company, and $2,000,000 of 8 per cent. preferred stock. Of this preferred stock the American Tobacco Company holds $1,596,100 at par, and there is held by others $403,900 at par. Under the laws of New Jersey the present P. Lorillard Company may be dissolved by the holders of two-thirds of the outstanding stock, and upon such dissolution the preferred stock is entitled to be paid at par: the balance of the assets going to the common stock. In view of the fact, however, that the preferred stock of the present P. Lorillard Company is an 8 per cent. preferred stock, with abundant assets and earnings to make the principal and income secure, it is deemed fair to the holders of this outstanding $403,900 of preferred stock that they be given an opportunity to take, at their option, either cash at par, which they are legally entitled to, or the 7 per cent. preferred stock of the proposed new P. Lorillard Company. As the preferred stock of the new P. Lorillard Company is to be a 7 per cent. preferred stock, the holders of said $403,900 of said present preferred stock will be offered stock of the new company at the rate of $114.25 for each share.

It is therefore proposed that the new .P. Lorillard Company provide for an additional amount of preferred stock sufficient to take care of $403,900 preferred stock on that basis, to wit, $114.25 in new 7 per cent. preferred stock for each $100 of said stock, amounting to $461,600 at par of preferred stock, in addition to that set out hereinbefore.. In view of the fact that in the statements hereinbefore made as to earnings of the P. Lorillard Company there is included only such part of the earnings of the present P. Lorillard Company as accrued to the proportion of its stock held by the American Tobacco Company, this increase of preferred stock would increase proportionately the profits of the P. Lorillard Company, and does not derange any of the figures hereinbefore given, or given in any of the exhibits hereto and hereinafter referred to.

(2)

American Snuff Company manufactures and sells a brand of snuff called "Garrett," which has a large sale in the Southern and Southwestern sections of the country. Originally this brand was manufactured at Yorklyn, Del., and in part packed in Philadelphia. Several years ago American Snuff Company determined, on account of freight rate conditions, to manufacture this brand at Clarksville, Tenn., and to pack it at Memphis, Tenn., and that the factories at Yorklyn, Del., should be given up to the manufacture of other brands. It has yet, though, been unable to produce in Clarksville, Tenn., goods similar to the goods heretofore and now made by it at Yorklyn, Del., although the experiment is still in progress, and with hope of success. Under the plan hereinbefore outlined, the brand "Garrett" snuff is allotted to American Snuff Company, and the factories, other than one factory at Yorklyn, Del., are allotted to George W. Helme Company. Your petitioners pray that in the approval and adoption by this court of this plan, American Snuff Company and George W. Helme Company be permitted to manufacture brands the one for the other, for a period not exceeding one year from March 1, 1912, each company paying to the other, as consideration for such manufacture, the cost thereof plus 5 per cent. The necessity of paying 5 per cent. above cost is sufficient inducement to each company to manufacture its own goods as soon as American Snuff Company is able to manufacture "Garrett" snuff of the requisite character and kind in its Clarksville factory, thus leaving the Yorklyn factories, other than No. 5, for the manufacture by the George W. Helme Company of its own brands.

This court, having heard the parties as directed by the Supreme Court of the United States, it is further ascertained and determined, and

Ordered, adjudged. and decreed that said plan hereinabove set forth is a plan or method which, taken with the injunctive provisions hereinafter set forth, will dissolve the combination heretofore adjudged to be illegal in this cause, and will recreate out of the elements now composing it a new condition which will be honestly in harmony with, and not repugnant to, the law, and without unnecessary injury to the public or the rights of private property.

It is further ordered, adjudged, and decreed that the said plan as hereinabove set forth be, and it is hereby, approved by this court, and the defendants herein are respectively directed to proceed forthwith to carry the same into effect.

The necessities of the situation in the judgment of this court requiring the extension of the period for carrying into execution said plan to a further time not to exceed 60 days from December 30, 1911,

It is further ordered, adjudged, and decreed that the defendants be allowed until February 28, 1912, to carry said plan into execution.

It is further ordered, adjudged, and decreed that the defendants, their officers, directors, servants. agents, and employés be, and they are hereby, severally enjoined and restrained as follows:

From continuing or carrying. into further effect the combination adjudged illegal in this cause, and from entering into or forming any like combination or conspiracy, the effect of which is or will be to restrain commerce in tobacco or its products, or in articles used in connection with the manufacture and trade in tobacco and its products, among the states or in the

territories or with foreign nations, or to prolong the unlawful monopoly of such commerce obtained and possessed by the defendants, as adjudged herein, in violation of the act of Congress approved July 2, 1890, either:

1. By causing the conveyance of the factories, plants, brands, or business of any of the 14 corporations among which the properties and businesses now in the combination are to be distributed, to wit: The American Tobacco Company, Liggett & Myers Tobacco Company, P. Lorillard Company, American Snuff Company, George W. Helme Company, Weyman & Bruton Company, R. J. Reynolds Tobacco Company, British-American Tobacco Company, Limited, Porto Rican-American Tobacco Company, MacAndrews & Forbes Company, J. S. Young Company, the Conley Foil Company, the Johnston Tin Foil & Metal Company, and United Cigar Stores Company, to any other of said corporations; by placing the stocks of any one or more of said corporations in the hands of voting trustees, or controlling the voting power of such stocks by any similar device; or

2. By making any express or implied agreement or arrangement together or one with another like those adjudged illegal in this cause, relative to the control or management of any of said 14 corporations, or the price or terms of purchase, or of sale, of tobacco or any of its products, or the supplies or other products dealt with in connection with the tobacco business, or relative to the purchase, sale, transportation, or manufacture of tobacco, or its products or supplies, or other products dealt with as aforesaid, by any of the parties hereto, which will have a like effect in restraint of commerce among the states, in the territories, and with foreign nations to that of the combination, the operation of which is enjoined in this cause; or by making any agreement or arrangement of any kind with any other of such corporations under which trade or business is apportioned between such corporations, in respect either to customers or localities.

3. By any of said 14 corporations retaining or employing the same clerical organization, or keeping the same office or offices, as any other of said corporations.

4. By any of said 14 corporations retaining or holding capital stock in any other corporation any part of whose stock is also retained and held by any other of said corporations; provided, however, that this prohibition shall not apply to the holding by the Porto Rican-American Tobacco Company and American Cigar Company of stock in Porto Rican Leaf Tobacco Company, nor shall it apply to the holding of stock of the National Snuff Company, Limited, by Weyman & Bruton Company and British-American Tobacco Company, Limited.

5. By any of said 14 corporations doing business directly or indirectly under any other than its own corporate name or the name of a subsidiary corporation controlled by it; provided, however, that in case of a subsidiary corporation the controlling corporation shall cause the products of such subsidiary corporation, which are sold in the United States and bear the name of the manufacturer, to bear also a statement indicating the fact of such control.

6. By any of said 14 corporations refusing to sell to any jobber any brand of any tobacco product manufactured by it, except upon condition that such jobber shall purchase from the vendor some other brand or product also manufactured and sold by it; provided, however, that this prohibition shall not be construed to apply to what are known as "combination orders," under which some brand or product may be offered to a jobber or dealer at a reduced price, on condition that he purchase a given quantity of some other brand or product.

It is further ordered, adjudged, and decreed that, during a period of five years from the date hereof, each of said 14 corporations hereinbefore named, its officers, directors, agents, servants, and employés, are hereby enjoined and restrained as follows:

1. None of the said 14 corporations shall have any officer or director who is also an officer or director in any other of said corporations.

2. None of said 14 corporations shall retain or employ the same agent or agents for the purchase in the United States of tobacco leaf or other raw

material, or for the sale in the United States of tobacco or other products; as that of any other of said corporations.

3. None of said 14 corporations shall directly or indirectly acquire any. stock in any other of said corporations,· or purchase or acquire any of the factories, plants, brands, or business of any other of said corporations, or make loans or otherwise extend financial aid to any other of said corporations.

The provisions of this decree shall apply only to trade and commerce in or between the several states and territories and the District of Columbia and trade and commerce between the United States and foreign nations.

. It is further ordered, adjudged, and decreed that British-American Tobacco Company, Limited, and the Imperial Tobacco Company (of Great Britain and Ireland), Limited, shall not act as agent for each other, nor employ a common agent, for the purchase of leaf tobacco in the United States, and neither of said two companies shall unite with any of the said 14 corporations among which the properties and businesses now in the combination are to be distributed, in the employment of a common agent for the purchase of tobacco leaf in the United States.

It is further ordered, adjudged, and decreed that each of the 29 individual defendants in this suit be enjoined and restrained from, at any time within three years from the date. of this decree, acquiring, owning, or holding, directly or indirectly, any stock, or any, legal or equitable interest in any stock, in any one of said 14 corporations, except British-American Tobacco Company, Limited, in excess of the amount to which he will be entitled under the provisions of the plan when the same shall have been carried out as proposed as the present owner of the amount of stocks in said several companies shown by the affidavits of said several defendants filed herein on the 16th day of November, 1911; provided, however, that any of said defendants may, notwithstanding this prohibition, acquire from any other or others of said defendants, or in case of death from their estates, any of the stock held. by such other defendant or defendants in any of said corporations.

· It is further ordered, adjudged, and decreed that the new companies whose organization is provided for in the plan hereinabove set forth, to wit, Liggett & Myers Tobacco Company, P. Lorillard Company, George W. Helme Company, ; Weyman & Bruton Company, and J.. S.. Young Company, shall, after their ; formation and by appropriate proceeding, be made parties defendant to this cause, and subject to the provisions of this decree, and bound by the injunctions herein granted.

It is. further ordered, adjudged, and decreed that any ·party hereto may make application to the court for such orders and directions as may be necessary or proper in relation to the carrying out of said plan and the .provisions of this decree.

It is further ordered, adjudged, and decreed that the costs of this action shall be paid by the defendants other than R. P. Richardson, Jr., & Co., Incorporated, as to whom the suit has heretofore been dismissed, and the payment by the defendant the American Tobacco Company of the reasonable costs and counsel fees of the committees organized for the protection of the 6 per cent. bonds, 4 per cent. bonds, and preferred· stock of the American Tobacco Company, is hereby approved.

It is further ordered, .adjudged, and decreed that the defendants the American Tobacco Company. MacAndrews & Forbes Company, American Snuff Company, and each of them, and their and each of their officers, directors, servants, agents, and employés, be severally enjoined and restrained as in said plan set forth, from voting stocks, exercising influence or control over other companies. or gaining possession of other companies through the use of securities temporarily held by them, respectively, under said plan, in each and every case in which it is provided in and by the said plan that any of said three last named defendants shall be so enjoined.

It is further ordered, adjudged, and decreed that such books and papers of the defendants the American Tobacco Company and S. Anargyros, or either of them, as relate to the suit of Ludington Cigarette Machine Company v. S. Anargyros and the American Tobacco Company, or the subject-matter thereof, or any part thereof, be preserved by the said defendants, respectively, un-

til after the accounting, if any, shall take place in said suit, and said suit be finally determined and ended.

It is further ordered, adjudged, and decreed that jurisdiction of this cause is retained by this court for the purpose of making such other and further orders and decrees, if any, as may become necessary for carrying out the mandate of the Supreme Court.

November 16, 1911.

E. HENRY LACOMBE,
Circuit Judge.

ALFRED C. COXE,
Circuit Judge.

H. G. WARD,
Circuit Judge.

WALTER C. NOYES,
Circuit Judge.